Cloyce K. BOX, Plaintiff,

v.

NORTHROP CORPORATION, the Aetna Casualty and Surety Company, the Chase Manhattan Bank, N. A., George A. Fuller Company, Inc., Max E. Greenberg, David A. Trager, Louis Zircher, H. E. Drayer, William V. Lawson, F. G. Lyon, James F. Murphy, Sr., and Roger K. Soderberg, Defendants.

No. 74 CIV. 4373.

United States District Court,
S. D. New York.

Aug. 31, 1978.

Mudge, Rose, Guthrie & Alexander by Henry Root Stern, New York City, Ford, Marrin, Esposito, Witmeyer & Bergman by Richard B. Marrin, John J. Witmeyer, III, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates by Samuel E. Gates, Robert L. King, Martin Frederic Evans, Eswin P. Rutan, II, New York City, for defendant Northrop Corp.

Hart & Hume by Jack Hart, Cecil F. Holland, Jr., New York City, for defendants The Aetna Cas. and Sur. Co., Max E. Greenberg and David A. Trager.

Milbank, Tweed, Hadley & McCloy by Andrew J. Connick, Lana R. Borsook, Mark S. Tulis, New York City, for defendants The Chase Manhattan Bank, N. A. and Louis Zircher.

Barrett, Smith, Schapiro, Simon & Armstrong by Michael F. Armstrong, Peter L. Agovino, Sandra G. Behrle, New York City, for defendant George A. Fuller Co., Inc.

## MEMORANDUM OPINION

### Findings of Fact and Conclusions of Law

MOTLEY, District Judge.

On December 15, 1971 the George A. Fuller Company, Inc. (Fuller), a company deeply in debt and in serious financial condition, was sold to the Northrop Corporation (Northrop). The recapitalization of Fuller was an integral part of the sale. Prior to the recapitalization, there were 10,000 shares of common stock outstanding. Plaintiff, Cloyce K. Box owned 2,000 or 20% of these shares. Pursuant to the recapitalization, the two major creditors of Fuller, The Chase Manhattan Bank, N. A. (Chase) and The Aetna Casualty and Surety Company (Aetna), received Fuller common stock in exchange for cancelling their debts and in exchange for Fuller preferred stock. Over 700,000 shares of common stock were issued to Chase and Aetna in return for the cancellation of over $20 million in debt. The unhappy result for the plaintiff, Box, was that his stock ownership of Fuller was reduced from 20% to .258%.[1]

Box's primary contention is that the above transaction was designed to illegally squeeze Box out of his 20% common stock ownership interest in Fuller, in violation of the common law fiduciary duties imposed upon all of the defendants. Box also alleges fraud in connection with the sale of Fuller in violation of the anti-fraud provisions of the federal securities laws.

Diversity of citizenship provides a basis for the jurisdiction of all of plaintiff's claims and the counterclaims of defendant Fuller. There is also federal question jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Jurisdiction as to certain claims also rests upon the principles of pendent jurisdiction.

This action was tried before the court without a jury. The court has dismissed the counterclaims of Fuller. Plaintiff's first, second, fourth, seventh, eighth, thir-

---

1. After the recapitalization and Northrop's purchase of Fuller common stock, there were 775,- 521 shares of common stock outstanding. Box owned 2,000 shares or .258% of the total.

teenth and fourteenth causes of action were dismissed on plaintiff's motion. All claims asserted against the individual defendants, except Max E. Greenberg, David A. Trager, and Louis Zircher (the three trustees of the common stock voting trust) have been dismissed. All claims against Fuller, with the exception of Box's derivative claims, have also been dismissed.

## THE FACTS

*Events Preceding the Acquisition of Fuller by Northrop*

The original George A. Fuller Company (Old Fuller) was founded in 1882 and was one of the nation's largest and most highly regarded construction companies of its kind. Old Fuller was responsible for the construction of such buildings as the United States Supreme Court, the United Nations, the United States Department of Justice, the Washington Cathedral, Lincoln Center, and the Lincoln Memorial. Box had been an employee of Old Fuller since 1952. By 1965 Box was a director and vice president of the company.

In early 1965, BCLM, Inc. (BCLM), a Maryland corporation, offered to purchase the assets of Old Fuller. Box was one of the four principals of BCLM.[2] Old Fuller was a public corporation. The principals of BCLM intended to convert Old Fuller to a close corporation. This was accomplished when Old Fuller was purchased by BCLM. Old Fuller was sold on June 30, 1965 to BCLM which paid $15,885,728 in cash for Old Fuller and assumed liabilities in the sum of $3,853,000. This purchase was financed, in part, by a $16 million loan from Chase. The loan was secured by Old Full-er's assets. (It was a substantial portion of this unsatisfied debt which was later cancelled by Chase in 1971 in return for Fuller common stock in connection with the 1971 recapitalization and sale to Northrop.) BCLM changed its name to the George A. Fuller Company, Inc. (Fuller). It sold all of its authorized common stock for $1 million, 2,500 shares to each of the four principals including Box. Thirty thousand shares of Fuller preferred stock were also sold at this time for $3 million. Box's total investment in Fuller was the $250,000 which he paid for his 2,500 shares of common stock. At this time, Box became chief executive officer of Fuller.[3]

Fuller did not fare well between 1966 and 1968. Due to various factors, including a chronic cash flow problem, increased overhead, and unprofitable jobs, Fuller lost approximately $18 million during that period. In January 1969, in an attempt to remedy these problems, especially the cash flow situation, Fuller's three shareholders other than Box sold all their common stock (75% of the outstanding common stock) to 140 Associates, a group controlled by Commonwealth United Corporation (CUC). CUC, itself, bought the 30,000 shares of Fuller preferred stock.

Since 80% of the common stock was needed to control Fuller,[4] 140 Associates bought an additional 500 shares of common stock from Box. CUC paid Box $350,000 for these shares, or $100,000 more than Box's investment in the full 2,500 shares in 1965. The result was that 140 Associates then owned 8,000 shares and Box owned 2,000 shares of the total 10,000 shares of outstanding common stock.

---

2. The other three individuals were Trammell Crow, William V. Lawson and Maurice Moore.

3. Ironically, certain shareholders of Old Fuller brought suit after the sale naming Box, among others, as a defendant. They claimed that Old Fuller violated the federal securities laws in soliciting false proxies in connection with the sale of Fuller's assets to the Box group. They also claimed that the price paid for the Old Fuller stock was inadequate. Judgment was entered for defendants on all claims. *Richland v. Crandall*, 262 F.Supp. 538 (S.D.N.Y.1967).

4. Article 5, § 2 of the amended articles of incorporation of BCLM, Inc. (which amendments also changed the name of BCLM, Inc. to George A. Fuller Company, Inc.) requires the consent of 80% of the common shareholders to, among other things, change the amount of authorized stock or its par value; effect a consolidation or merger with any other corporation; and change the relative rights and preferences of the preferred and common stock.

Fuller continued to lose money in 1969. After its purchase of the Fuller stock, CUC loaned an additional $2.7 million to Fuller to protect CUC's investment. The situation did not improve, and in July 1969 CUC installed Francis G. Lyon to try to reverse Fuller's deteriorating position. Box voluntarily withdrew from active management of Fuller. He remained a director, however, until March 1971.

No less concerned than CUC with Fuller's financial condition were Chase and Aetna. By 1969 Chase was still owed $9 million of its original $16 million investment. Aetna was surety for Fuller on Fuller's performance and payment bonds in 1969 and had been for many years prior thereto. Aetna continued to be liable on such bonds after CUC's stock purchase. By late 1969, Aetna was potentially liable for over $70 million in performance and payment bonds. Consequently, a Fuller bankruptcy would have meant a substantial loss for Chase but it would have been disastrous for Aetna.

On October 14, 1969, Fuller advised Aetna that without additional financial assistance, all of Fuller's work—including work bonded by Aetna—would halt within 48 hours. Since traditional lines of credit were understandably closed to Fuller, Aetna, after analyzing the financial situation, agreed to assist Fuller. The assistance took the form of guaranteeing a $5 million line of credit from Chase in order to maintain a facade of normalcy so that Fuller could obtain the volume of future work needed to keep it afloat.[5]

Aetna's decision to finance Fuller was conditioned upon the forbearance of other creditors [6] (in order to forestall bankruptcy) and, among other things, the execution of voting trust agreements by all of Fuller's shareholders. The purpose of the voting trust agreements was to assure that Fuller had a responsible management which would protect and repay Chase's line of credit

which was guaranteed by Aetna. The voting trust agreement with Box provided that the three trustees, to be appointed by Aetna and consented to by Box (which consent could not be unreasonably withheld) would have the sole power to vote Box's stock. Box's voting trust agreement would last for the shorter of ten years or until the line of credit from Chase, which was guaranteed by Aetna, was repaid.

Although Box maintains that he was coerced into signing the voting trust agreement, the court finds that Box signed the agreement willingly, albeit unhappily, knowing that execution of the agreement was a necessary condition of Aetna's financial assistance and any hope of recovery for Fuller. The voting trust agreements with Box, CUC, and 140 Associates and the loan agreements among Chase, Aetna and Fuller were executed in November and December 1969.

Aetna appointed as voting trustees two independent attorneys as representatives of Aetna, Max E. Greenberg and David A. Trager. Thomas D. Hill was appointed as representative of Chase. Hill was later replaced by Louis Zircher (Zircher). Greenberg, Trager and Zircher remain the only individual defendants in this action in connection with the recapitalization of Fuller in 1971.

From December 1969 to December 1970, Fuller's financial condition continued to deteriorate. Fuller still could not make ends meet, having lost over $8 million in 1969 and $2.5 million in 1970. Fuller was unable to obtain enough business in 1970 through 1971 to stay solvent. In 1970 it had obtained only half the amount of work needed to generate a net profit sufficient to cover its overhead. By the time of its acquisition in December 1971, Fuller anticipated suffering a loss on its $74 million backlog of uncompleted work after already suffering losses

5. The $5 million ceiling was subsequently increased with the consent of all concerned, including Box. Prior to the December 15, 1971 recapitalization and sale of Fuller, Aetna reimbursed Chase for the money which Chase had advanced pursuant to the guarantee.

6. These included two judgment creditors, Almirall-Joy joint venture and McNamara Corporation Limited, to which Fuller was indebted for .8 million and over $3 million respectively.

over the past six years aggregating in excess of $30 million. In sum, by December 1971 Fuller did not have sufficient cash to meet its current obligations and was faced with imminent bankruptcy unless it received additional cash infusions.

Fuller's debt position was as bleak as its negative cash flow situation. Fuller was in excess of $25 million in debt. This included a $3 million debt to a judgment creditor, McNamara Corporation Ltd. and a $9.3 million debt to Chase which represented the unpaid principal on the original $16 million loan to Fuller in 1965. However, by this time, Fuller was deepest in debt to Aetna. Under the guaranteed loan agreement entered into among Chase, Aetna and Fuller in 1969, Aetna had paid over $11 million in principal and interest to Chase to cover Chase loans to Fuller between 1969 and 1971. Aetna had directly loaned to Fuller an additional $1.4 million when Chase had eventually refused to advance any further sums to Fuller.

Given Fuller's negative cash flow position, its history of sustained losses and its enormous debt, the only alternatives open to Fuller at this time were either bankruptcy or the sale of the company.

### Northrop's Purchase of Fuller

Prior to February 1971, Fuller had approached numerous companies as potential purchasers of Fuller. Negotiations with Northrop began around February 1971. The possibility of the sale of Fuller to Northrop was announced to the Fuller shareholders in May 1971, although Northrop continued its financial investigation of Fuller through that summer. During this time, Box was neither invited nor allowed to participate in the negotiations among Fuller, Chase, Aetna and Northrop, although he was generally advised as to the progress of these negotiations.[7]

In June 1971 a non-binding agreement was reached among Northrop, Chase and Aetna concerning the sale of Fuller. A major concern of Northrop was that Fuller be delivered with a "clean balance sheet". That is, the negative shareholders' equity of approximately $25 million was to be converted to a positive shareholders' equity of approximately $800,000.

In addition, Northrop was determined to limit its contingent liabilities in connection with claims on Fuller jobs in progress. Aetna was to assume the major responsibility of satisfying those claims. The mechanism for the creation of this clean balance sheet would be that Chase and Aetna would cancel their claims against Fuller in return for Fuller stock. Northrop would then purchase 100% of the Fuller stock in return for certain fixed and contingent payments to Chase and Aetna.

In October, Box was approached by Fuller and asked what price he would accept for his 2,000 shares of common stock. Box replied that he wished to deal directly with Northrop. On October 21 a meeting was held which Fuller, Northrop, Chase, Aetna, Exeter International Corporation (Exeter) (the beneficial owner of 8,000 shares of Fuller common of which 140 Associates was record holder) and Box's attorney attended. Box declined to appear personally. At that meeting, Exeter agreed to sell its 8,000 shares for $250,000, or $31.25 per share. The sale was not consummated at this time, but only after the recapitalization on December 15, 1971.[8] No agreement was reached with Box's attorney with respect to Box's stock.

Anxious to acquire the remaining 20% of the Fuller common stock in order to expedite the sale of Fuller, the defendants put pressure on Box to sell his shares. First, Chase threatened to call Box's personal loan

---

**7.** The court finds that defendants did keep Box sufficiently apprised of significant on-going developments in connection with the Northrop negotiations. Defendants did not breach any fiduciary duty to Box on the ground that they failed to offer assistance to him in connection with the negotiations.

**8.** It was later agreed among the defendants that Northrop and Aetna would each buy 4,000 shares of the Exeter common stock.

with Chase if Box continued to refuse to sell his stock. Box resisted this pressure. The defendants and Box, this time personally, then met twice in Dallas, Texas. Box again refused to sell his Fuller common stock. The defendants again attempted to exert pressure on Box. They met with officers of the First National Bank of Dallas and suggested that the bank call Box's personal loan with that bank which was collateralized by the 2,000 shares of Fuller common stock. The Dallas bank refused, noting that Box's loan was not in default.[9]

The main sticking point in the negotiations among Box and the defendants was the price to be paid for the stock. The amount demanded by Box equalled the outstanding principal on the Dallas loan, $250,000, which had initially been utilized by Box to purchase the 2,500 shares of Fuller common stock in 1965, plus $62,500, the potential tax liability on the sale of Box's stock. Defendants believed the stock to be essentially worthless and refused to pay the sum demanded. Defendants offered to pay Box $62,500 for his shares, or $31.25 per share, the same price paid for Exeter's stock.

Northrop decided to close the Fuller deal despite the fact that it could not buy 100% of the Fuller stock. On December 15, 1971, at a special meeting of shareholders, and after approval by the Fuller Board of Directors, Exeter voted 80% of the Fuller common stock in favor of the recapitalization. The voting trustees also voted unanimously in favor of the recapitalization. The number of shares of Fuller common stock was increased from 10,000 shares of $100 par value to 1,500,000 shares of $1 par value. The par value of the 10,000 outstanding shares was reduced to $1.

The major elements of the recapitalization were as follows: [10]

—Chase received 291,156 shares of common stock in exchange for the cancellation of its entire debt of $9,317,000. An exchange at the rate of $32 per share.

—Chase received 93,750 shares of common stock in exchange for 30,000 shares of preferred stock. An exchange at the rate of $32 per share for the preferred stock which had a par value of $100 per share.

—Aetna received 349,365 shares of common stock in exchange for the cancellation of its debt incurred in connection with the guaranteed line of credit with Chase, or $11,179,670. An exchange at the rate of $32 per share.

—Aetna bought 4,000 shares of common stock from Exeter for $125,000, or $31.25 per share.

—Northrop bought 31,250 shares of common stock directly from Fuller for $1 million cash, or $32 per share, in order to increase Fuller's working capital.[11]

—Northrop bought 4,000 shares of common stock from Exeter for $125,000 or $31.25 per share.

This recapitalization reduced Box's ownership of Fuller from 20% to .258%. This is the gravamen of Box's lawsuit.

---

**9.** These pressure tactics constituted breaches of defendants' fiduciary duties. Box alleges other breaches of this duty by Chase and Aetna through the voting trustees including the filing of a frivolous lawsuit by Fuller in order to blacken Box's reputation; the cancellation of Box's employment contract; and trustee Greenberg's conflict of interest with respect to Fuller. The court need not inquire into the latter three allegations because none of the breaches of fiduciary duty alleged by Box are actionable in themselves. In the context of this case, the actions by the fiduciaries are simply evidence that Box was later treated unfairly with respect, *specifically,* to the recapitalization and offer of $62,500 for Box's Fuller stock. The fact that defendants did breach their fiduci-

ary duty towards Box is also to be considered in allocating the burden of proof with respect to the fairness to Box of the sale of Fuller to Northrop.

**10.** The recapitalization was effected both by Fuller's shareholders and Board of Directors. The shareholders authorized the issuance of 1,500,000 shares of Fuller common stock. The Board of Directors actually issued these shares in exchange for the cancelled debt of Chase and Aetna.

**11.** Northrop's purchase of this stock was pursuant to its agreement with Chase and Aetna to purchase Fuller.

On the same day, December 15, 1971, Northrop purchased Fuller. Chase and Aetna then transferred all of their Fuller common stock to Northrop in return for the following:

—Chase received $100,000 cash immediately.

—Chase and Aetna were jointly to receive $240,385, plus interest one year later.

—Chase and Aetna would be entitled to contingent payments of ⅔ of the net profit of Fuller in excess of $1 million in each of the subsequent eight years to a maximum of $7 million.

—Chase and Aetna would be entitled to contingent payments of 50% of all benefits which Northrop obtained from Fuller's tax loss carry forward.

The parties to this lawsuit dispute whether the purchase price of Fuller included Northrop's payment to Aetna of $1.4 million in April 1972. This was in satisfaction of Aetna's direct loans to Fuller after Chase refused to advance any further sums under the guaranteed loan agreement with Fuller and Aetna.

During this entire time, Box was offered $62,500 for his 2,000 shares, or $31.25 per share.

In December 1974, through the mechanism of a short form merger, Fuller was merged with Northrop. Box was again offered $62,500 for his stock which he refused.

## THE MERITS

### Fiduciary Duty of the Defendants

Plaintiff claims that, as de facto majority shareholders of Fuller acting in concert, defendants owed a fiduciary duty to Box to treat him fairly with respect to the recapitalization. Box further argues that defendants are charged with the burden of proving that the recapitalization was fair to Box.

■ Plaintiff's cause of action for breach of defendant's fiduciary duty pertains to the issuance, allotment and alleged "watering" of Fuller common stock. These are matters which involve the conduct and management of the internal affairs of Fuller. Plaintiff's claims with respect to breach of fiduciary duty are, therefore, governed by the laws of Maryland, Fuller's state of incorporation. *Rogers v. Guaranty Trust Co. of New York,* 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652 (1933); *Perlman v. Feldman,* 219 F.2d 173, 175 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Haberman v. Murchison,* 331 F.Supp. 180, 186 (S.D.N.Y.1971), *aff'd* 468 F.2d 1305 (2d Cir. 1972) (Maryland law governs fiduciary count of complaint). There appears to be a scarcity of Maryland law on the subject. However, since it appears that there is no conflict of state laws with respect to the legal relations and liabilities of fiduciaries, the court will rely on other states' laws in approximating what the law of Maryland would be.[12]

■ Both the directors of a corporation and its majority shareholders stand as fiduciaries toward the corporation and the minority shareholders. As fiduciaries, they are bound to act in the interests of the corporation and are prohibited from pursuing any narrow self-interest in dealing with the property of the minority shareholders. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Singer v. Magnavox Co.,* 380 A.2d 969, 976 (Del.1977); *Northway, Inc. v. T. S. C. Industries, Inc.,* 512 F.2d 324, 339 (7th Cir. 1975), *rev'd on other grounds,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Perlman v. Feldman, supra,* 219 F.2d at 175; *Farber v. Servan Land Co., Inc.,* 393 F.Supp. 633, 637 (S.D. Fla.1974), *vacated on other grounds,* 541 F.2d 1086 (5th Cir. 1976). Fuller concedes that it owed a fiduciary duty toward Box.

■ The nominal majority shareholder was Exeter. Exeter is not a defendant in this action. Rather, the plaintiff's theory is that the named defendants were controlling shareholders of Fuller de facto.

The voting trust was established in 1969. Two trustees, Greenberg and Trager, repre-

12. The parties cite the laws of many states in their briefs.

sented Aetna, and Zircher (replacing Hill) represented Chase. The voting trustees were empowered by the voting trust agreements to vote 100% of the common stock. The voting trustees voted on four occasions. The trustees voted for Fuller's directors on three occasions. Box only complains of the December 15, 1971 recapitalization which the voting trustees and Exeter signed.

The parties dispute whether the voting trustees or the Fuller management ran Fuller on a daily basis. While it does appear that the trustees took a backseat role, the court places little importance on this question in light of defendants' oral agreement to buy Exeter's 8,000 shares, or 80% of Fuller common stock on October 21, 1971.

Robert B. Friedlander, who acted for Exeter, believed that Exeter's shares were worthless on the open market and that he could only demand the value of the "control" represented by these shares. On October 21, 1971 he orally agreed to sell the shares at a future date for $250,000. From that point onward, Exeter was, realistically, only the nominal owner of the shares because it was ready to vote those shares in any way requested by the purchaser of Exeter's stock. The purchase of Fuller by Northrop was conditioned on a recapitalization of Fuller. Exeter knew that it could only receive its $250,000 if it voted for this recapitalization.

If Exeter was only the nominal owner of the 8,000 common shares, who was the actual owner? The court finds that Chase, Aetna and Northrop should be considered the actual owners of the controlling stock in determining the fiduciary duty owed Box under the facts of this case.

At least as early as June 22, 1971 Chase, Aetna and Northrop had tentatively agreed on terms for the sale of Fuller. The terms included Northrop's purchase of the Fuller common stock. This stock purchase was a central unchanging feature of the sale of Fuller. Although the interests of Northrop diverged from those of Chase and Aetna with respect to the selling price of Fuller, the three corporations had a common interest in obtaining 100% of the Fuller common stock in order to expedite the purchase of Fuller.

■ Specifically, Chase, Aetna and Northrop acted in concert in offering $250,000 for Exeter's common stock. In addition, these defendants were, in fact, jointly responsible for the tactics later used to pressure Box into selling his stock. Since Aetna, Chase and Northrop may be considered to have acted in concert with respect to Box, and to have aided and abetted the acts of each other, their liability towards Box, if any, will be joint. *duPont Glore Forgan, Inc. v. American Telephone and Telegraph Co.,* 69 F.R.D. 481, 485–86 (S.D.N.Y.1975); *Illinois Rockford Corp. v. Kulp,* 41 Ill.2d 215, 242 N.E.2d 228, 234 (1968). Maryland recognizes causes of action alleging conspiracies to deprive one of his property. *Maddox v. Fidelity Investment and Title Co., Inc.,* 300 F.2d 1, 4 (4th Cir. 1962), *cert. denied,* 371 U.S. 816, 83 S.Ct. 29, 9 L.Ed.2d 57 (1962).[13]

■ The final preliminary legal question before analyzing the fairness of the recapitalization is which party has the burden of proving that the recapitalization and sale was fair to Box. The facts demonstrate that the defendants, Chase, Aetna and Northrop, wished to obtain the common stock of Fuller in order to consummate the sale of Fuller and salvage whatever possible for Aetna and Chase—who were owed over $20 million from Fuller. To this end they attempted to pressure Box to sell his stock. When these attempts failed, Fuller was recapitalized in such a way that Box's minority ownership of Fuller plummeted from 20% to .258%. The court finds that plaintiff has sustained his burden of coming forward with evidence of the defendant fiduciaries' self-dealing. Therefore, defendants have the burden of proving that the deal was fair to Box, the minority shareholder. *Pepper v. Litton, supra,* 308 U.S. at 306, 60 S.Ct. 238; *Perlman v. Feldman, supra,* 219 F.2d

13. It is unnecessary to decide whether Chase and Aetna stand as fiduciaries toward Box by virtue of their representation by the voting trustees.

at 177; *Farber v. Servan Land Co., Inc., supra,* 393 F.Supp. at 637; *Kohn v. American Metal Climax, Inc.,* 322 F.Supp. 1331, 1353–55 (E.D.Pa.1970), *modified,* 458 F.2d 255 (3d Cir. 1971), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1971); *Singer v. Magnavox Co., supra,* 380 A.2d at 976.

### Fairness of the Recapitalization to Box

The fundamental question in this case is whether Box was treated fairly when the defendants recapitalized and transferred ownership of Fuller, i. e., whether Box was entitled to more than the $62,500 offered for his shares. The court holds that defendants have sustained their burden of proving that the transaction was fair to Box, the minority shareholder.

In determining whether the transaction was fair to Box, the analysis may be conveniently divided into three inquiries:

1) Was the recapitalization of Fuller necessary?

2) If so, was defendant's debt converted into equity at the proper exchange price?

3) If so, was Box offered fair value for his stock?

### 1. Necessity of Recapitalization

Between 1965, the year that Box and his associates purchased Fuller, and 1971, the year Fuller was recapitalized, Fuller's economic fortunes slid deeper and deeper into the abyss of final disaster. In 1965, as previously noted, Fuller was purchased for $15,885,728 in cash and was capitalized, in part, with $1 million in shareholders' equity.[14] By 1971 it had a negative shareholders' equity of $25.8 million. This sum essentially reflected the continuous and substantial losses suffered by Fuller between 1966 and 1971. Fuller noted profits in only two of those six years and lost an average of $5 million per year for a total of $30 million.

The other side of this picture was Fuller's debt position. Fuller survived these sustained losses—and averted bankruptcy—by deferring the repayment of its substantial debt to Chase and by borrowing millions of dollars from Aetna and others. Aetna only loaned money to Fuller in a desperate attempt to minimize potential losses on $70 million of Fuller's projects which were bonded by Aetna.

By 1971 Fuller's debt to Chase, Aetna and other creditors exceeded $25 million. Its shareholders' equity was a negative $25.8 million. As of September 30, 1971 Fuller had lost $1.4 million for the year. The court finds, and the uncontradicted evidence indicates, that the only alternatives for Fuller by 1971, aside from continued cash infusions from Aetna, were either bankruptcy or the sale of Fuller to a healthy corporation.

Box would have fared worse than he did had Fuller gone into bankruptcy. Under a straight liquidation of Fuller, Box would have received nothing for his common stock since Fuller had few assets. Liquidation of Fuller would have provided its creditors, who had priority over the common shareholders, with only a few cents on the dollar. A reorganization of Fuller in bankruptcy was not a realistic possibility. Such a reorganization would hurt Fuller's ability to obtain new jobs since customers would be wary of its ability to properly complete the work. In addition, Fuller's most pressing single need in 1971 was an infusion of working capital. Only an acquisition by a healthy company, not merely a reorganization, could accomplish this.

From another point of view, Fuller could probably not have been "given away" unless it were recapitalized. It is inconceivable that any purchaser would have assumed the substantial liabilities of Fuller considering its prior losses and its apparent inability to show significant and sustained profits.

Prior to the commencement of serious negotiations among Chase, Aetna, Fuller

---

14. Shareholder's equity is also called "net worth" and "book value". It consists of the shareholders' contributions to the corporation including the stated value of the outstanding stock, the amount paid in excess of the stated value and retained earnings or accumulated deficits transferred from the income statement.

and Northrop, Fuller had unsuccessfully approached over forty other companies in the hope of selling Fuller. The record indicates that Northrop was the only corporation to seriously consider the possibility of purchasing Fuller. It is equally clear from the record that one of the primary conditions for the sale of Fuller to Northrop was that Fuller would be reorganized such that it would end up with a "clean balance sheet". That is, a balance sheet on which Fuller's massive debt would be eliminated and on which Fuller would have a positive stockholders' equity of at least $800,000, as compared with its then negative stockholders' equity of approximately $25.8 million.

Since Box refused to sell his 20% minority interest, defendants were forced to recapitalize Fuller in order to accomplish the dual goals of eliminating the debt and reflecting the true value of Box's 2,000 shares of stock. A simple cancellation of the Chase and Aetna debt would have been a windfall to Box. As creditors, Chase and Aetna had a superior claim to Box, a common stockholder, to the profits and, potentially, the assets of Fuller. Chase and Aetna were clearly entitled to receive common stock in return for relinquishing this prior claim and in consideration for the millions of dollars they had already invested in Fuller.

Fuller had to be sold to survive. Its debt had to be eliminated as a condition of this sale. Because of Box's refusal to sell his common shares, Chase and Aetna were entitled to recapitalize Fuller in order to both eliminate Fuller's substantial debt and protect their own future financial position in Fuller. The next question is whether the *terms* of the recapitalization were fair.

### 2. *Fairness of the Conversion Price of Debt into Equity*

■ The essence of the Fuller recapitalization was the issuance of new common stock and the conversion of the Chase and Aetna debt into common stock. The conversion price was $32 of debt per share. Accordingly, Chase converted $9,317,000 in debt into 291,156 shares; Chase also converted 30,000 preferred shares (par value of $100 per share) into 93,750 shares of common stock; and Aetna converted $11,179,670 in debt into 349,365 common shares. The end result of the recapitalization was that Box's percentage of common stock was reduced from 20% to .258%.[15]

The crucial point to note with respect to this conversion is that the reduction of Box's percentage ownership is a direct function of the conversion price. For example, if the debt were converted into common stock at the rate of $1,000 per share, Box's percentage ownership would have fallen to only 5.8%. Similarly, a conversion price of less than $32 per share would have resulted in a percentage ownership of less than .258%.

The $32 per share conversion price was derived from the fact that Exeter sold its 8,000 shares for $250,000 or $31.25 per share.[16] Defendants argue that the sale of the Exeter stock set a ceiling on the fair value of Box's common shares for the purpose of the recapitalization. This court agrees.

There was little or no evidence bearing directly on what the conversion price should have been. Even more significant is the fact that none of the parties presented a sound theory on which to base an analysis of the conversion price. There is a conceptual irony which involves the conversion price and Box's stock. As discussed below Box's shares were indeed worthless prior to the recapitalization. Thus an infinite number of shares could have been exchanged for Chase and Aetna's debt (at a conversion price of $0) without watering Box's worthless 2,000 shares. However, no party dis-

---

**15.** The total number of Fuller common shares outstanding was 775,521, including 2,000 owned by Box, 353,365 owned by Aetna (including the 4,000 Exeter shares), 384,906 owned by Chase and 35,250 owned by Northrop (including the 4,000 Exeter shares).

**16.** Since Box would benefit by a higher conversion price, defendants rounded the purchase price of the Exeter stock up to the nearest dollar, to $32, when the debt was converted to equity.

putes that the recapitalization breathed new life—and value—into Fuller and that Box, as a common shareholder was entitled to share in these benefits. Therefore, an infinite number of shares could *not* be exchanged for the debt. So, how *many* shares should Chase and Aetna receive in return for their debt?

Working backwards from the post-recapitalization value of Fuller does not help. Even if we determine that this value is $X, the question still remains as to what should be Box's *share* of this revitalized Fuller which is now worth $X. Again, the court is without a theory on which to base an analysis.

However, one way of deciding whether the conversion price was fair to Box is to compare the price paid for Exeter's stock. There is sufficient evidence to demonstrate from this comparison that $31.25 per share was the maximum reasonable value of Box's common stock and that a conversion rate of less than $32 per share, which would have been less favorable to Box, would also have been appropriate.

Defendants presented undisputed evidence—from Fuller management and from an independent expert—that prior to the recapitalization, the Fuller common stock was worthless.[17] In light of Fuller's slide into near bankruptcy by 1971, this analysis was undoubtedly true.[18]

The parties focus much attention on Exeter's sale of its 8,000 shares for $250,000 and dispute whether this was or was not an arm's length transaction from which the fair market value of the Fuller common stock could be derived. Anderson, as representative of Chase, Aetna, and Northrop, negotiated with Robert B. Friedlander, as representative of Exeter, for the sale of Exeter's stock. Friedlander had only a general idea of the true financial condition of Fuller. He believed, and the court so finds, that the Fuller common stock was worthless on the open market, and that the $250,000 paid for Exeter's shares was the price of "control" of Fuller. The defendants needed Exeter's 8,000 shares, or 80% of the Fuller common stock, to effect the recapitalization and essentially paid Exeter $250,000 for the control value of the stock.

If $250,000 was essentially paid only for control of Fuller, then, in contrast, Box's minority share of Fuller common stock was worth an inconsequential amount—if anything. Defendants did not need any of Box's shares to conclude the deal since Fuller's articles of incorporation required an affirmative vote of only 80% of the common stock to effect a recapitalization.[19]

Considering the overwhelming testimony that the Fuller common was worthless prior to the recapitalization and considering that the $31.25 per share paid for the Exeter stock reflected control of Fuller and set an absolute *ceiling* on the value of Box's shares, the $32 conversion price was entirely appropriate. Box, however, while offering little or no evidence to contradict the above analysis, lays much stress on the fact that his share of common stock was reduced from 20% to .258%. This is hardly as outrageous as it might seem at first glance.

A rough measure of the equities of the recapitalization can be obtained by measuring the investment of the parties in Fuller. In 1965 Box invested $250,000 in Fuller in return for 2,500 shares of stock—or $200,000 for 2,000 shares.[20] Under the recapital-

---

**17.** The experts explained that the value of common stock in general is a combination of the expected future profits and growth of the company. From 1966 through 1971 Fuller earned no profit and the amount of work executed each year remained stable through 1970 and plummeted in 1971.

**18.** Another indication of the worthlessness of Box's stock is the fact that he was apparently unable to sell his shares to any third parties other than the defendants. However, the court places no reliance on this fact due to the illiquidity of closely held stock in general.

**19.** Box put himself into this position voluntarily when he sold his 500 shares, and the control of Fuller, to CUC in 1969 for a substantial price.

**20.** While Chase and Aetna emerged from the Fuller disaster having lost millions of dollars, Box got out with a profit. He bought 2,500 shares for $250,000, was paid $350,000 by CUC for *only* 500 of these shares and was offered $62,500 for his remaining 2,000 shares by the

ization, Northrop, Chase and Aetna exchanged $24,671,670 in debt, preferred stock and cash for their common stock. Box's investment represented only .847% of Chase, Northrop and Fuller's investment. But Box should receive even less than .847% of the common stock since Chase and Aetna's debt theoretically represented a less risky investment than Box's investment in common stock. The creditors' priority position with respect to Fuller's earnings should be reflected in the final distribution of common stock after the recapitalization by allocating a greater number of common shares to the creditors.

The fairness of Box's post-recapitalization stock ownership may be viewed from another angle. As discussed below, the post-recapitalization value of Fuller was approximately $3.5 million. Although Box's 2,000 shares represented only .258% of the common stock ownership, he was offered $62,500 for these shares or 1.786% of the post-recapitalization value of Fuller.

### 3. *Post-recapitalization Value of Fuller*

■ Having determined that Box's ownership of Fuller was legitimately reduced from 20% to .258% by the recapitalization, the final question is whether Box was offered the equivalent of .258% of the post-recapitalization value of Fuller. Box was offered $62,500 for his stock, which is .258% of $24,224,806. Thus, if Fuller were worth *more* than $24 million after the recapitalization, then Box was offered too little for his stock in violation of the fiduciary duties of defendants. Uncontradicted testimony demonstrates that Fuller was worth substantially less than $24 million.

There were five expert witnesses at trial. Plaintiff presented four experts who testified on the value of Fuller as of the date of their testimony in 1977. Defendants' expert, James A. Martens, testified as to the value of Fuller both immediately after the recapitalization and as of the date of trial. Martens' testimony was both credible and uncontradicted.

All parties agree that the definition of the fair market value of Fuller after the 1971 recapitalization is:

> The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

*United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1953). Assuming for the moment that all parties had reasonable knowledge of relevant facts,[21] the court agrees with Martens that the most appropriate measure of the post-recapitalization value of Fuller was the price paid by Northrop for the company.[22] The deal consisted of numerous elements. The parties dispute whether some elements of the deal are properly considered in determining the value of Fuller. Therefore, the court will assign two dollar amounts for each element: first, the court's judgment as to the relevance of that element to the fair market value of Fuller and second, the maximum amount that that element might contribute to the fair market value.

The transfer of Fuller essentially consisted of the transfer of all of Chase and Aetna's common stock to Northrop and the

defendants—a profit of $162,500. Box also received a ten year employment contract with Fuller when he sold his shares to CUC. In contrast, when the deal was concluded and Fuller had been sold to Northrop and all payments were made to Chase and Aetna, Chase had lost approximately $10 million on its investment in Fuller and Aetna had lost approximately $11 million.

**21.** Box's claim that Northrop did not disclose Fuller's potential involvement in the Peace Hawk program is discussed below.

**22.** Martens appears to contradict himself in one respect. He estimates the post-recapitalization value of Fuller at $3–4 million using an analysis based on a comparison with the earnings and book value of the Turner Construction Company (Martens Tr. 4167, 4244–46). On the other hand, Martens says the best way to value Fuller is to see what Northrop paid for it, estimated by Martens to be a bit less than $1.5 million (Martens Tr. 4232).

purchase of additional Fuller common stock by Northrop. The elements of the deal were as follows:

—Northrop paid Exeter $125,000 for 4,000 shares of Fuller common stock.

| | |
|---|---|
| estimated value | $125,000 |
| maximum value | 125,000 |

—Chase received $100,000 cash from Northrop in exchange for its common stock.

| | |
|---|---|
| estimated value | $100,000 |
| maximum value | 100,000 |

—Chase and Aetna received a note for $240,385 plus interest payable in one year to be divided between the two as Chase and Aetna would decide.

| | |
|---|---|
| estimated value | $240,385 |
| maximum value | 240,385 |

—Northrop bought 31,250 common shares of Fuller for $1 million or $32 per share. Although this money was paid into Fuller as working capital, it benefited Aetna by assuring Fuller of enough working capital to, hopefully, successfully complete the $70 million worth of jobs bonded by Aetna. All parties agree that this payment is properly considered an element of the value of Fuller.

| | |
|---|---|
| estimated value | $1,000,000 |
| maximum value | 1,000,000 |

—Northrop agreed to pay to Chase and Aetna two thirds (⅔) of all Fuller profits in excess of $1 million per year for eight years and up to a maximum of $7 million. Neither Northrop nor defendants' expert assigned any value to this contingency.[23]

| | |
|---|---|
| estimated value | ? |
| maximum value | $7,000,000 |

—Northrop agreed to pay to Chase and Aetna one half (½) of all monies saved through the utilization of Fuller's tax loss carry forward. Neither Northrop nor defendants' expert assigned any value to this contingency.[24]

| | |
|---|---|
| estimated value | ? |
| maximum value | $6,240,000 |

—In April 1972 Northrop repaid certain remaining debts of Fuller to Aetna which had not been extinguished in the recapitalization. This repayment was not part of the formal purchase of Fuller and its payment to Aetna was by no means guaranteed in December 1971. It appears to the court that this sum is not appropriately included in the purchase price but is the repayment of an outstanding Fuller debt.

| | |
|---|---|
| estimated value | $        0 |
| maximum value | 1,436,335 |

Northrop paid $1,465,385 for Fuller plus the present value of the contingent future payments.[25]

It is virtually impossible to estimate the value of the contingent payments. The present value of these payments is a function of both the expected amount of these payments and the probability that that amount will be paid. There was no expert testimony with respect to any of these calculations. An internal Northrop document dated August 30, 1971 predicts that earnings of Fuller in excess of $1 million for the years 1972 through 1978 inclusive would amount to $10.8 million. However, no probabilities are assigned to these figures, and the actual excess profit between 1972 and 1976 turned out to be $0.

Northrop and Martens assigned a value of $0 to these contingent payments. However, that judgment should be taken with a grain of salt in light of Northrop's excess profit prediction of $10.8 million and in view of the fact that these contingent pay-

---

**23.** No money was ever paid under this contingency.

**24.** No money was ever paid under this contingency, although, as of mid-1977, the Internal Revenue Service was considering the allowance of this tax loss carry forward. The present value in 1971 to Chase and Aetna of the amount under consideration, at an 8% discount rate, would have been $3,057,730.

**25.** As part of the agreement to buy Fuller, Northrop agreed to loan additional sums to Fuller as needed, up to $4 million. This money would be repaid by Fuller at Northrop's interest rate. Substantial sums were advanced by Northrop. Part of the loan was repaid and part was converted to equity capital after Fuller merged with Northrop in 1974.

ments, being an allocation of profit, if any, would not "cost" Northrop anything. The record indicates that Northrop would have been satisfied with a profit of $1 million per year and was willing to split the excess "gravy" with Chase and Aetna (although Northrop's attitude toward the tax loss carry forward is less clear).

At the least, it is fair to infer from the record that payment of the maximum contingency was highly unlikely. However, even if all contingent payments were to be paid their full amount (without discounting to present value and without discounting for the probability that they would not be paid the maximum) and including all questionable sums in calculating the value of Fuller, Northrop paid, at most, $16,141,720 for Fuller—still far short of the $24 million value needed to justify paying even $62,500 to Box.

The above analysis of Fuller's value is based on the assumption that the value is equivalent to the price paid for Fuller by Northrop. Defendants' expert witness, Martens, also valued Fuller using other techniques. Martens determined that Fuller and the Turner Construction Company (Turner) engaged in the same type of construction business and could be suitably compared for valuation purposes. If anything, Martens suggested that any comparison would overvalue Fuller since Turner was the "Cadillac" of the construction business and is simply a better company than Fuller. In 1971 Turner was selling on the American Stock Exchange at approximately seven times estimated earnings for 1972. This figure was approximately 1.6 times its book value per share. Applying a multiple of seven to Fuller's estimated 1972 earnings of $.5 million gives a value of $3.5 million. Applying a multiple of 1.6 to Fuller's post-recapitalization book value of $1,871,000 gives a value of $3 million.

The court feels that the $3.5 million estimate based on earnings is overvalued and that the estimate based on book value is not a sound method on which to evaluate a company such as Fuller. First, as noted by Martens and reflected in this record, Turner had had an excellent and consistent earnings record prior to 1971. In contrast, the earnings record of Fuller was abysmal. Thus, lower multiples should be applied to Fuller's figures than those derived from an analysis of Turner's financial information. The $.5 million profit prediction of Fuller for 1972 is open to question considering the 1971 loss of $1.5 million, Fuller's history of poor forecasting and the actual 1972 performance which resulted in a loss of $575,000. Second, the court agrees with plaintiff's experts that basing the valuation of a company on its book value is unsound. Book value may vary according to the accounting techniques used. There are instances of very valuable companies which have negative book values.

Martens used other techniques as a check on his estimated value of Fuller. The court places less emphasis on these valuation techniques due to their admitted deficiencies and questionable accuracy. In any case, it is clear that the value of Fuller does not begin to approach $24 million using any of these techniques.

In conclusion, $3.5 million appears to be a generous estimate of Fuller's value using the multiple of earnings technique. The discounted cash flow method of valuation appears to be too risky in Fuller's case to be of any value. In purchasing Fuller, Northrop paid roughly $1.5 million plus future contingent payments. Therefore it appears that Martens' estimate of Fuller's value of $3–4 million is in the ballpark. Taking the higher figure and dividing by the 775,521 outstanding shares of Fuller common stock gives a value of $5.16 per share. Box was offered $31.25 per share. Box was treated fairly.[26]

---

26. Box's stock had a pre-recapitalization value of $0 and a post-recapitalization value of something less than $5.16 per share. This phenomenon is not hard to explain. As previously noted, Fuller probably could not have been given away prior to the recapitalization considering its liabilities. This was because the creditors had first call on the profits of the firm and could plunge Fuller into bankruptcy at their election. No person would buy a firm under

*Box's Federal Securities Claims*

Box alleges that Northrop violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. Box argues that, in the negotiations preceding its December 15, 1971 purchase of Fuller, Northrop failed to disclose that Northrop intended to utilize Fuller in connection with the "Peace Hawk" project in Saudi Arabia. The relevant aspect of Peace Hawk involved construction projects totalling roughly $500 million in connection with the sale of military aircraft to Saudi Arabia.

Plaintiff's individual 10b–5 claims were dismissed at trial on the ground that plaintiff was neither a buyer nor seller of securities. The remaining claim is a derivative one on behalf of Fuller which sold 31,250 shares of Fuller common to Northrop for $1 million. Aside from the reason discussed below for dismissing this claim, there would appear to be no damages even if Northrop were liable. Damages would be measured by the difference between what Northrop paid for the stock and what the stock would have been worth if the withheld information had been disclosed. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The court has found that the post-recapitalization value of the Fuller common stock was certainly no greater than $5.16 per share. Northrop paid $32 per share for the stock. It is inconceivable that full disclosure of what Northrop knew about Peace Hawk would increase the value of the stock to anywhere near $32 per share.

Box's argument runs as follows: Northrop became an insider of Fuller when the oral agreement was reached to buy Exeter's stock on October 21, 1971. Northrop knew, but did not disclose prior to the December 15 recapitalization and sale of Fuller, that Fuller would be used in connection with Peace Hawk. This work would add substantially to Fuller's future revenues and, therefore, Fuller's value as of December 15, 1971 was substantially greater than the amount Northrop paid. This claim fails on factual grounds.

Even if, for purposes of Rule 10b–5, Northrop could be considered an insider of Fuller, and even if certain information relating to Peace Hawk could be considered "inside information"—questions this court need not reach—Box has not proved that Northrop withheld any material information from Fuller. Northrop purchased Fuller in the hope that Fuller could be resuscitated and utilized in connection with Northrop's international construction projects. In 1971 Northrop knew that Northrop would be responsible for roughly $20 million of construction projects in connection with Phase III of Peace Hawk. This information was not material because, in 1971, Northrop contemplated using companies other than Fuller to do this work, and the volume of this work was not sufficient to regard it as material with respect to Fuller. Phase V of Peace Hawk involved roughly $500 million worth of construction and furnishings. Phase V was not envisioned by the Saudis, the United States Air Force or Northrop until the summer of 1974, and Northrop could not possibly have known in 1971 that Fuller would be utilized in connection with that project. Northrop was not required to disclose a mere prediction. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir. 1968).

*Box's Remaining Causes of Action and Summary*

Box's actual complaint is that he did not get enough money for his 20% stock interest in Fuller. Box's remaining contentions are not significantly different and are also without merit.

Plaintiff has failed to prove a cause of action for fraud. Nor have defendants violated any of Box's rights as a shareholder of Fuller.

those conditions. By cancelling their debts, Chase and Aetna relinquished these valuable rights, namely their first call on the income of Fuller. After the recapitalization the owner of Fuller had renewed control over its income, and Fuller no longer was obliged to pay out millions over the ensuing years in satisfaction of Chase and Aetna's debt. Thus, after the elimination of this debt, the value of Fuller as reflected in its common stock rose considerably.

Box alleges that the trustees violated Box's voting trust agreement when the recapitalization of Fuller was effected. That document bore the signatures of the 80% common shareholder, Exeter, as well as the signature of the three voting trustees. Paragraph six of the voting trust agreement reads in full:

The Trustees, or any of them, may, as individuals be a stockholder, director or officer of Fuller and no contract or transaction entered into by Fuller shall be affected by the fact that it is made with the Trustees or any of them personally or with a firm or partnership of which they are members or with a corporation of which they are officers or directors, provided such contract be approved or ratified by the Stockholder (Box) which approval shall not be unreasonably withheld.

Even if it is assumed that the recapitalization was a "contract or transaction" entered into with firms (Chase and Aetna) of which the trustees were members, Box's claim must fail. First, the court finds that Box unreasonably withheld his approval of the recapitalization. The elimination of Fuller's debt was essential to its survival, and the recapitalization was essential to the elimination of this debt in light of Box's legitimate refusal to sell his stock. Box could not reasonably block the recapitalization and put the survival of Fuller in jeopardy as a way of extracting a greater price for his stock.

Second, the quoted provision provides that if the trustees do enter into a contract with their own firm, then the contract will be "affected". The court interprets this provision to mean that the contract will then be tested as if it were one which appeared, on its face, to involve self-dealing. This situation most commonly arises in situations where a director or officer of a corporation contracts directly with the corporation. The Maryland courts have held that, in that situation, the burden is on the

director or officer to prove that the transaction was fair and reasonable to the corporation. *Chesapeake Construction Corporation v. Rodman,* 256 Md. 531, 261 A.2d 156, 158 (Ct.App.1970). Compare Maryland Corporations and Associations Law, § 2–419(b)(2), effective July 1, 1976, which codifies the above rule.[27] The court has found, *supra,* that defendants have met their burden of proving that the recapitalization was fair and reasonable to Fuller.

Box alleges that by voting for the recapitalization the trustees breached their fiduciary duties toward Box. The above discussion demonstrates that this allegation is not true.

Box has failed to prove that defendants conspired to wrongfully interfere with Box's contractual rights.

Box has failed to prove that defendants conspired to wrongfully interfere with the market for Box's stock.

Box also sues derivatively on behalf of Fuller claiming that defendants conspired to defraud Fuller. Plaintiff has failed to prove this claim.

This action is dismissed as against all defendants.

See order filed this date.

---

**27.** Section 2–419(b)(1)(ii) also provides that the shareholders may ratify a contract between a corporation and its directors by majority vote.

Exeter effectively ratified the recapitalization by voting its 8,000 shares in favor of it.