**DANAHER CORPORATION, DH Acquisition Corp. and Danwest Partners, Plaintiffs,**

v.

**CHICAGO PNEUMATIC TOOL COMPANY, Thomas P. Latimer, G. Russell Moir, Barry J. Shillito, John R. Kennedy, Jr., Andrew Schultz, Jr., Edmund J. Kelly, Melvin R. Laird and David G. Moore,. Defendants.**

**John D. SPEARS, Plaintiff,**

v.

**Thomas P. LATIMER, G. Russell Moir, Barry J. Shillito, John R. Kennedy, Jr., Andrew Schultz, Jr., Edmund J. Kelly, Melvin R. Laird, David G. Moore, and Chicago Pneumatic Tool Company, Defendants.**

**Nos. 86 Civ. 2357 (PNL), 86 Civ. 2448 (PNL).**

United States District Court, S.D. New York.

April 10, 1986.

See also, D.C., 635 F.Supp. 246.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Danaher plaintiffs; Jerome S. Hirsch, Robert E. Zimet, George A. Zimmerman, Marco E. Schnabl, Charles F. Walker, of counsel.

White & Case, New York City, for Chicago Pneumatic defendants; Thomas McGanney, Dwight Healy, James Laughlin, of counsel.

Lowey, Dannenberg & Knapp, New York City, for plaintiff John D. Spears; Neil Selinger, Henry Brachtl, of counsel.

LEVAL, District Judge.

These are motions for preliminary injunction brought in the context of litigation over a tender offer for the stock of defendant Chicago Pneumatic Tool Co. ("CP"). The plaintiffs and movants in these two consolidated actions are Danaher Corp. (and related entities), the tender offeror for CP stock, and John D. Spears, a shareholder of CP who brings a derivative action against CP's directors. The principal object of both motions (and actions) is to rescind CP's recent funding of its Employees' Stock Ownership Plan ("ESOP") with one million shares of its common stock. A hearing was held on the motions for preliminary injunction by the taking of depositions over the course of the week, submission of briefs and affidavits, and oral argument conducted on April 7, 1986.

The principal thrust of the plaintiffs' complaints is that CP's Board violated the duties of care and loyalty in establishing and in funding the ESOP, actions which the plaintiffs allege were taken for the purpose of protecting management from hostile tender offers. Plaintiffs also allege that CP violated the fraud provisions of § 10(b) of the 1934 Act and of § 14(e) of the Williams Act by failing to disclose pertinent provisions of the ESOP to the shareholders. In order to prevail on a motion for preliminary injunction in this Circuit, the moving party must show irreparable harm and either likelihood of success on the merits or a fair question for litigation with the balance of hardships tilting decidedly in favor of the movant. *Jackson Dairy v. Hood,* 596 F.2d 70 (2d Cir.1979). I find that the plaintiffs have failed to meet the *Jackson Dairy* standard and that the motions for preliminary injunction must be denied.

### FACTS

In 1984, CP's Board of Directors and Management began to give intensive con-sideration to the establishment of an ESOP under recent changes in the tax laws. It consulted its outside counsel and an actuarial consultant. At a meeting of the Board of Directors on February 12, 1985, the subject was discussed extensively and a presentation was made by a financial officer, Ralph Brandifino. Mr. Brandifino and outside counsel made a further presentation at the next Board meeting on March 12, 1985. The Board then voted to authorize the establishment of an ESOP and designated Thomas P. Latimer, the Chief Executive Officer of the Company, as its trustee. In April 1985, CP distributed its notice of annual meeting and proxy statement making no mention of the Board's resolution to adopt an ESOP. On May 14, 1985, the ESOP was formally established pursuant to the Board's prior resolution. The trust agreement was formally signed. This was reported and a copy of the agreement filed with the company's current Form 10–Q. The ESOP provides that its trustee Latimer was to have the sole power to vote unallocated shares held in the plan. It provides also that the trustee, although at other times removable by the Board of Directors, cannot be removed during a tender offer or proxy contest. The trustee was given the power to decide whether to tender unallocated shares held by the Plan in the event of a tender offer.

In June 1985, CP made an initial funding of the ESOP with two blocks of ten thousand shares each. The purpose of this initial funding was to test accounting procedures based on two different patterns of contribution. The Board ratified this funding on August 6, 1985.

A question the company regarded as significant was whether the ESOP should be funded with stock little by little in accordance with its needs over the years or, at the outset, with a large block sufficient to cover many years' future needs. The comparative impacts on tax and on per share earnings were considered. At the Board meeting on November 5, 1985, Mr. Latimer proposed that the ESOP should be funded with one million shares of CP's stock. The

impact of such action on the company's finances was discussed, and the Board adopted a proposal to increase the ESOP's stockholdings to one million shares.

In order to offset the dilutive effect on per share earnings of the issuance of new shares to the Plan, the company embarked on a program of acquisition of shares in the marketplace, holding them in treasury to be used to fund the Plan. It acquired 1,400,000 treasury shares during the next months.

The funding of the ESOP was on the agenda to be considered at the Board meeting of February 1986; it was not taken up at that time, Mr. Latimer having directed that the discussion be deferred pending his receipt of further information concerning integration of the plan with the company's pension plans and the positions of CP's lending banks with respect to loan covenants.

On March 7, 1986, a notice was circulated to CP's directors of a meeting to be held on Tuesday, March 11. The notice was accompanied by an agenda which included a discussion of the Employee Stock Ownership Plan. The agenda stated:

> At this time management is proposing to contribute up to 1.0 million shares to the ESOP and these shares would be amortized over a 20 year period at up to 50 thousand shares per year. The source of the share contribution would come from the present 1.4 million shares held in the treasury....

> In line with this, a resolution is attached for Board of Director consideration for up to a 1.0 million share contribution. Exhibit II is a tabular presentation reflecting the change in common stock ownership positions as a result of contributions (from Treasury) to the ESOP at amounts of 250 thousand shares or 1.0 million shares.

This agenda was accompanied by a proposed resolution authorizing the contribution of 1 million shares to the ESOP and by tables illustrating the effect on various financial figures of contributions to the ESOP of 250 thousand shares and 1 million shares.

By coincidence Friday, March 7, 1986, the day of distribution of the agenda proposing the million share funding, was the day on which the plaintiff Danaher Corp. began to acquire CP's shares in the open market. Danaher acquired approximately 30 thousand shares that day causing an increase in the price of CP's shares.

The market was, of course, closed on Saturday and Sunday. On Monday and Tuesday, March 10th and 11th, Danaher acquired no more shares. Meanwhile, at its meeting on March 11th, CP's Board, in accordance with the proposal distributed on March 7th, authorized the transfer of 1 million shares of treasury stock to the ESOP. The following day, March 12th, Latimer made a transfer of 300 thousand shares to the ESOP and caused the execution of a loan agreement between CP and its ESOP obligating the ESOP to pay for the shares over a 20 year period. Also on March 12th, Danaher again entered the market for CP's shares and acquired an additional 70 thousand shares, causing a further rise in the market price.

This market activity was noticed by Latimer who later testified at his deposition that on March 12th he wondered whether "there may be a creeping tender buried in our market activity." (Latimer Dep. p. 14.) Latimer explained that by creeping tender he meant the purchase of "shares in the market over a period of time with the objective of achieving a 20%, or thereabouts, interest in the stock of the company." (Dep. at 16–17.) He testified that he did not believe anybody would be seeking to take over CP because CP was protected by an unusual charter provision authorized by New Jersey law, which permitted 5% of the shareholders to block a merger, unless at the time of the merger proposal an extraordinary premium was paid to all remaining outside shareholders.

The next day, March 13th, Latimer caused two press releases to be issued. One announced the transfer of the 300 thousand shares to the ESOP. The other

advised that "speculators may be accumulating [CP's] stock." (Latimer Ex. 2) This release advised brokers to explain to their customers the unique provisions of CP's charter relating to takeovers.

On March 17, 1986, Mr. Latimer arranged for a Board meeting to be held by telephone the following day. On March 18th, Latimer transfered an additional 700 thousand shares to the ESOP, completing the million-share funding that had been authorized, and so advised the Board. He also recommended to the Board that it authorize the transfer of the additional 400 thousand shares of CP stock held in the Treasury. The Board voted to do so.

In the meantime, on March 13 through 19, Danaher had continued to acquire CP's shares in the open market. The following day, March 19, 1986, Danaher announced that it had acquired nearly 10% of CP's stock and made a public offer to acquire all CP's shares at $38 per share. CP's stock had traded at $22.25 on March 6th before Danaher began its open market acquisitions.

## DISCUSSION

Plaintiffs' claims fall into two basic categories: the state law claims asserting breach of fiduciary duties of loyalty and care; and the federal law claims alleging fraudulent material omissions under § 10(b) of the 1934 Act and § 14(e) of the Williams Act, as well as alleged failure to communicate with shareholders in connection with the tender offer as required by Rule 14e–2, promulgated under the Williams Act. As to none of these have plaintiffs demonstrated entitlement to preliminary injunctive relief.

1. *Duty of Loyalty.* With respect to the duty of loyalty, plaintiffs argue that the establishment of Latimer as trustee of the ESOP with voting power over its unallocated shares, especially when taken in connection with the super-majority provisions of CP's charter that permit the holders of 5% of CP's shares to block a merger except on terms commanding a high premium, was a transaction that preserved con-

trol in the existing board and management. Plaintiffs further argue that the issuance of 1 million shares to fund the ESOP between March 12–18 was an action taken to fend off Danaher's takeover bid, securing the safety of management. Plaintiffs argue that these actions should be seen as self-dealing transactions with a consequence that under the business judgment rule, the burden shifts to the defendants to prove that their actions were fair to the corporation and were justified by legitimate, primary objectives, as opposed to the objective of preserving their control. *See Norlin Corp. v. Rooney Pace,* 744 F.2d 255 (2d Cir.1984); *Treadway Co. v. Care Corp.,* 638 F.2d 357, 382 (2d Cir.1980); *Asarco Inc. v. MRH Holmes A. Court,* 611 F.Supp. 468, 471 (D.N.J.1985); *Francis v. United Jersey Bank,* 87 N.J. 15, 432 A.2d 814, 820 (1981); *Berkowitz v. Power Mate,* 135 N.J.Super. 36, 342 A.2d 556, 571 (1975). Indeed, some courts have held that the issuance of shares to an ESOP shortly after a challenge to corporate control gives rise to an inference of improper motive. *See, e.g., Klaus v. Hi-Shear Corp.,* 528 F.2d 225, 231 (9th Cir.1975); *Podesta v. Calumet Industries, Inc., et al.,* [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill. 1978).

I agree with the plaintiffs that such transactions having the capacity to secure management justify a shift in the burden of proof, depriving the defendants of the more extreme protection of the business judgment rule. It is true that by assuming the position of trustee of the ESOP, Latimer, the Chief Executive Officer, acquired the power to decide whether or not to tender its shares in response to an outside offer, as well as the power to vote its shares to block a merger. This justifies placing the burden of proof on management.

Nonetheless, by the evidence before the Court on this preliminary injunction motion, the defendants succeed in proving that these transactions were entered into in good faith for the corporate benefit and did

not have as a primary or dominant motivation the preservation of control in management.

Plaintiffs' briefs argue vehemently that the one million-share funding on March 12th and 18th were responses to CP's perception that there must be a secret acquisition concealed in the heightened market activity. The evidence, however, completely belies this argument. The million-share funding was authorized by the Board of Directors as early as November 1985, four months before plaintiffs began their acquisitions. The agenda distributed to the Board of Directors on March 7th advised that management proposed to make the million-share funding "at this time." Plaintiffs did not begin to acquire CP stock until the same day, March 7th, and do not contend that CP could have even suspected plaintiffs' intentions earlier than March 12th, when the million-share funding had already been authorized by the Board of Directors and the first 300 thousand shares already transferred. The establishment and funding of the ESOP had been a subject of attention and repeated discussion by the Board throughout the twelve previous months. There is every indication that it was undertaken because the Board and management of CP believed it would be a good thing for their corporation and there is virtually nothing to support plaintiffs' contention that it was done to barricade management.

The cases on which plaintiffs rely to support their contention that defendants' actions constituted a breach of their fiduciary duties of loyalty bear, at best, a superficial resemblance to the facts in this action.

In *Norlin Corp., supra,* for example, the court based its finding of impropriety on the fact that the board of directors had created the ESOP "in the context of a contest for control." *Id.* at 265. The court found the timing of the ESOP's creation critical. The Norlin ESOP was adopted and funded in the wake of a takeover attempt, a mere five days after the district court refused to enjoin defendants from making further purchases of large blocks of plaintiffs' stock. The board had acted in great haste. Finding no corporate purpose in the ESOP's creation, the court emphasized that Norlin's board had never discussed adopting such a plan prior to the battle for corporate control.

Similarly, in *Podesta, supra,* the decision to preliminarily enjoin management from voting shares it had transferred to an ESOP during a takeover battle was based on the finding that the ESOP was created and the shares transferred in great haste and in a "desperate attemp[t] ... to defeat the challenge to [management's] control." (¶ 93,556) The court relied heavily on its finding that the board of directors had never even considered adopting an ESOP prior to the challenge for control. (¶ 93,556) Moreover, in *Podesta* the defendants essentially conceded that the ESOP was designed, at least in part, to retain corporate control against the offeror.

Finally, *Treadway Co., supra,* supports a finding of primary *corporate* purpose in this action. There the Court of Appeals reversed the district court's finding of lack of corporate purpose largely because the allegedly improper sale of stock to a third company had been under the board's consideration long before the takeover attempt had begun.

As to the duty of loyalty claim, not only have the plaintiffs failed to show likelihood of success on the merits, it is even questionable whether they have shown "a fair question for litigation" under the second branch of the *Jackson Dairy* test. But even assuming that plaintiffs have satisfied this element of the test, they have failed as discussed below to show a balance of hardships tilting in their favor.

2. *Duty of Care.* Plaintiffs are no more successful in their effort to show entitlement to a preliminary injunction by reason of the CP directors' breach of the duty of due care. Plaintiffs argue that further analyses should have been performed and experts retained before the CP directors acted in establishing the ESOP.

In circumstances where corporate fiduciaries appear to have acted out of self-interest, it is particularly appropriate to give scrutiny to the question whether they discharged their duty of the exercise of care. Here, however, as noted above, CP has borne the burden of proving convincingly that its actions in establishing and funding the ESOP were not taken out of self-interest, but in proper discharge of their fiduciary obligations to CP. On this preliminary record, CP has shown that it studied the ESOP question over a lengthy period of time, considering several different approaches to the project, including the tax and corporate earnings implications of each. No doubt plaintiffs can point to additional tests and studies they argue should have been conducted. Perhaps it would have been more prudent to do so. But a stockholder certainly cannot enjoin corporate transactions taken in good faith by the corporation merely on a showing that it would have been more prudent for the directors to study the matter further before acting.

Even assuming for argument that the directors were not as careful as they should have been, it does not necessarily follow that plaintiffs are entitled to have the corporate action rescinded. In order to obtain preliminary injunctive relief against the directors in a derivative action, plaintiffs must show irreparable harm *to the corporation*. A decision taken without sufficient prior study is not necessarily a wrong decision. It is perfectly possible that further consultation and deliberation would merely confirm the desirability of the earlier decision. No showing is made by the plaintiffs that the corporation suffered irreparable harm as a result of management's failure to consult further experts and run additional sets of hypothetical numbers. thus, even if the duty of due care required more study than was done here, the record before this court does not show irreparable harm to CP and does not support the issuance of a preliminary injunction in a stockholder derivative action.

The actions here taken by the target company have virtually no similarity to those found to justify injunctive relief in *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264 (2d Cir.1986). There the court concluded that a hastily delivered irrevocable "crown-jewel" option, selling the target company's principal income producing assets at what appeared to be an inadequate price, would irreparably harm the corporation. There has been no showing of any remotely comparable harm to CP by reason of the establishment of the ESOP. Nor, as noted above, is there convincing evidence that the ESOP was created as a defensive maneuver.

3. *Federal Securities Law Claims.* Plaintiff Spears contends that CP's failure to advise its shareholders in a series of communications since March 1985 of the pertinent facts concerning the establishment of the ESOP constituted a material, fraudulent omission in violation of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5.

There are several problems with this contention. First, under New Jersey law, there was no requirement that an ESOP be submitted for shareholder approval. The Court of Appeals has held that full disclosure to the Board of Directors is sufficient to satisfy Rule 10b–5 in instances where the approval of shareholders is not required. *Maldonado v. Flynn*, 597 F.2d 789, 793 (2d Cir.1979). Second, this is the kind of claim that begs the question. It asserts that a corporate maneuver was scheming, fraudulent, and improperly motivated, and proceeds from there to the obvious conclusion that failure to disclose so improper a connivance must be a material omission. The Supreme Court has specifically rejected such attempts to bring arguable violations of state law fiduciary duties within the ambit of the nondisclosure provisions of Rule 10b–5. *Santa Fe Industries v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Such an attempt to transpose a state law claim into a violation of the federal securities laws is all the more unsuccessful where, as here,

plaintiffs have failed to show that the formulation of the ESOP was motivated by improper self-interest.

Plaintiff Danaher also claims violations of § 10(b), as well of § 14(e) of the Williams Act, which prohibits misrepresentations or misleading nondisclosures in connection with tender offers. In *Schreiber v. Burlington Northern,* —— U.S. ——, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), the Supreme Court applied the reasoning of *Santa Fe* to such parallel contentions under the Williams Act. Thus, Danaher's claims are subject to the same infirmities discussed above with respect to plaintiff Spears.[1]

Finally, as to the failure to disclose the possibility of delisting by the New York Stock Exchange, that possibility, if any, is far too speculative to warrant injunctive relief. This is not a case like *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 253–54 (2d Cir.1973), where defendant's actions would have clearly violated the Exchange Rules and where the Exchange had warned plaintiff that it was in danger of losing its listing. Nor is it analogous to *Norlin Corp., supra,* where the Exchange announced an intention to delist the Norlin securities. Here we have only plaintiff's self-serving construction of the "enforcement gloss" given to the Exchange Rules. This is too thin a reed to support a preliminary injunction. In any event Danaher does not contend that the alleged material omissions justify rescinding the ESOP. Spears's argument that they do is farfetched and unconvincing. Even if fault were found with the completeness of CP's disclosures, the remedy would be to require full and fair disclosure, not to rescind a lawful and appropriate corporate act.

4. *Balancing of Harms.* Under the second branch of the *Jackson Dairy* test, a preliminary injunction is to be granted in spite of the movant's failure to show likelihood of success on the merits if, in addition to the constant requirement of showing irreparable harm, the movant can show a fair question for litigation with the balance of hardships tipping decidedly in his favor. In my view, plaintiffs have failed to show that the hardships tip their way.

Danaher began to purchase CP's shares at a time when the number of shares outstanding was temporarily reduced. CP had been acquiring shares for its treasury in anticipation of reissuing them to fund the ESOP. Thus, while a year earlier CP had had nearly 5 million shares outstanding, after its program of acquisition of treasury stock for use in funding of the ESOP, it had only 4 million shares outstanding with a million-four in the treasury. However, when Danaher announced its tender offer on March 19, 1986, CP had already funded the ESOP with one million shares, so that its outstanding stock was once again in the neighborhood of 5 million shares. Danaher therefore faces 5 million rather than 4 million shares and would therefore require an additional $38 million to buy the outstanding CP stock at the tender offer price. (A substantial part of the additional $38 million would be indirectly recovered if the ESOP tendered its stock since the ESOP would be required immediately to repay to CP the loan embodied in the original funding. The ESOP would therefore be left with only the profit it had realized on the increase in value since the funding dates; the rest of the $38 million would go to Danaher's subsidiary, CP.) In the event the ESOP did not tender to Danaher, this would increase the number of shares entitled to receive special bonus compensation in the event of a squeeze-out merger.

But to say that CP's action in establishing and funding the ESOP makes Danaher's tender offer and merger plans more expensive and difficult, does not necessarily mean that Danaher has suffered irreparable harm or a balance of hardships in its favor. Any valid corporate act involving the issuance of additional stock done in this period (such as the acquisition of a new

---

**1.** Danaher's claims relating to Schedule 14D–9 and the requirements of Rule 14e–2 were effectively mooted by CP's filing of its third amended Schedule 14D–9 and its circulation to its shareholders of a letter advising them of its position on the tender offer.

facility) would have involved adverse consequences for Danaher's tender offer. As indicated above, the establishment and the funding of the ESOP was planned for well over a year for the legitimate and valid corporate purpose of motivating and compensating CP's employees. There is no indication that the million-share funding planned since the previous November, placed on the Board's agenda on March 7th when Danaher first began its secret buying, and approved on March 11th before Danaher's second day of buying, was in any way motivated by a desire to frustrate Danaher's as yet unknown tender offer aspirations.

Plaintiffs seek to undo a proper and legitimately motivated corporate act of CP, simply because it makes it more difficult and expensive for plaintiffs to succeed in their acquiring CP. This does not tilt the hardships in plaintiffs' favor. This case is fundamentally unlike *Hanson, supra,* where the acts of incumbent management of the target company would have caused irreparable harm to its shareholders, as well as to the bidder. In cases like *Hanson,* there is little or no weight on management's side of the scales in balancing the hardships, for the corporate act whose rescission is sought is harmful to the corporation. Here, by contrast, there is little weight on the bidder's side, while the act sought to be undone was a legitimate act undertaken by management for the corporate benefit.

The motions for preliminary injunction are denied.

SO ORDERED: