William **STEINER** on behalf of himself and all other Stockholders of Gordon Jewelry Corporation similarly situated, Plaintiff,

v.

**GORDON JEWELRY CORPORATION,** Harry B. Gordon, Aron S. Gordon, W. Lowry Barfield, Danile P. Gordon, James C. Gordon, Douglas B. Gordon, Jack S. Blanton, Roy L. Dye, Jr., Arnold M. Miller, and L. William Heiligbrodt, Defendants.

No. 87 C 4032.

United States District Court, E.D. New York.

Dec. 15, 1987.

Goodkind, Wechsler, Labaton & Rudoff (Stuart D. Wechsler, Joel C. Feffer, and Linda P. Nussbaum, of counsel), New York City, for plaintiff.

Carter, Ledyard & Milburn (James W. Rayhill, Beth D. Jacob, Lawrence F. Carnevale, and Bernard Cedarbaum, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff brought this action against Gordon Jewelry Corporation (the Corporation) and its directors, alleging that an offer (which expires midnight, December 16, 1987) by the Corporation to purchase for cash up to 2,000,000 shares of its common stock was in violation of Rules 13e–3, 13e–4, and 10b–5 of the Securities and Exchange Commission (the Commission) and of the law of Delaware. Plaintiff has moved for a preliminary injunction. The court allowed expedited discovery and held a hearing on the motion on December 11, 1987.

The Corporation, organized in Delaware, is a large jewelry retailer, operating 613 stores in 42 states. Members of the Gordon and Miller families now own 44% of the outstanding shares. If the offer is accepted those families will own 54%. In December 1984 the Corporation's board of directors authorized the Corporation to buy 500,000 of its shares in the open market. To date the Corporation has bought almost that entire authorized amount. In early 1986 the Corporation bought 808,260 shares from another stockholder, which, according to the Corporation, had solicited the purchase.

In the summer of 1987 the Corporation considered a leveraged buy out or a large-scale acquisition and consulted Goldman, Sachs & Co. (Goldman, Sachs), which did an analysis of the options available to the Corporation. Management then rejected the idea of a leveraged buy out. In August 1987 Daniel Gordon, the Corporation's chief executive, wrote a memorandum outlining various scenarios if the Corporation went private.

After the precipitous decline in the stock market on October 19, 1987, the board of directors discussed the possibility of buying the corporate stock, and again asked Goldman, Sachs to prepare an analysis of a leveraged buy out. Goldman, Sachs' first proposal, of a leveraged buy out of 100% of the stock, was rejected by the Board, as was the second proposal, namely, such a buy out of stock unaffiliated with the Gordon and Miller families.

Around November 11, 1987 the Corporation asked Goldman, Sachs to analyze a possible tender offer for 2,000,000 of the corporate shares. On November 16, 1987 the board of directors resolved to make the offer at $15 a share. On November 17, 1987, the last full day of trading before the beginning of the offer on November 18, 1987, the last reported sales price was $13–3¾ a share.

A party moving for a preliminary injunction in the Second Circuit must establish: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litiga-

tion and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief." *Kaplan v. Board of Education,* 759 F.2d 256, 259 (2d Cir.1985).

Plaintiff contends first that the offer violates Rule 13e–3 of the Commission's rules. The Commission issued that rule under Section 13(e) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78m(e), authorizing the Commission to regulate acquisitions by a public company of its publicly held stock. Under the facts here the rule applies if the offer has "a reasonable likelihood or a purpose of," directly or indirectly, either causing the corporation's shares to be held of record by less than 300 persons or causing the shares to be delisted by the New York Stock Exchange (Exchange). The Corporation admits that if the rule applies, the offer did not contain all the requisite information, in particular an opinion by the Corporation assessing the offer's fairness.

Plaintiff contends that the "purpose" of the offer was to take one step in a "creeping" effort to go private. The court does not draw such an inference from the facts of record. The board of directors rejected proposals of leveraged buy outs, and nothing in the record justifies a conclusion that the present offer was but a step in a plan to cause the stock to be delisted or the number of its stockholders to be reduced below 300.

Plaintiff also urges that the offer has a "reasonable likelihood" of causing a delisting by the Exchange. That is not the view of the Exchange. Vincent Plaza, Vice President of Operations and Policies of the Exchange, testified that the chief criterion beyond which it will not usually look in considering whether to maintain a listing is whether, after an offer is completed, the public holds at least 600,000 shares with an aggregate market value of at least $5 million. Here, if 2 million shares are tendered, 3.8 million public shares of a market value of some $50 million will remain.

Plaintiff notes that the offer reserves the right of the Corporation to accept tender of greater than 2,000,000 shares. However,

no evidence of record supports the conjecture that the Corporation will or could in bad faith exploit this exception in blatant violation of Rule 13e–3.

Plaintiff asserts that completion of the offer will probably reduce the number of round lot holders below the Exchange's criterion of 1200. However, according to the testimony of Vincent Plaza, the Exchange would not ordinarily consider the number of round lot holders if the criterion with respect to outstanding shares held by the public were met. Moreover, the testimony satisfies the court that it would be highly unlikely that the Exchange, even if advised of a deficiency of round lot holders, would delist the shares in the present circumstances.

Accordingly, the court finds that speculation about a remote possibility of delisting under Rule 13e–3 establishes neither a likelihood of success nor a serious question on the merits. *See, e.g., Danaher Corp. v. Chicago Pneumatic Tool Co.,* 633 F.Supp. 1066, 1073 (S.D.N.Y.1986).

Plaintiff's contentions with respect to Rules 13e–4 and 10b–5 stand on a different footing. Plaintiff cites various alleged violations of these rules, including the failure to make disclosures as to the Corporation's finances, activities and prospects. Further, plaintiff says the failure to make such disclosures was a breach of the directors' fiduciary duties under Delaware law.

On this motion the court need not address these matters. Since there is little likelihood of a delisting, even if plaintiff's contentions have merit, he has not met the irreparable harm prerequisite for a preliminary injunction. If stockholders who tender receive an unfairly low price for their stock, damages will make them whole. Measurement of those damages is hardly impossible. This is not a case where the corporate structure will be forever changed.

The December 1, 1987 opinion in *Eisenberg v. Chicago Milwaukee Corporation* [Available on WESTLAW, 1987 WL 25357], where the Delaware Court of Chancery, New Castle County, preliminarily enjoined a corporation's self-tender offer is not com-

parable. There the entire class of preferred stock was to be eliminated by the offer, and one of its purposes was avowedly to effect delisting.

The motion for a preliminary injunction is denied. So ordered.