SAMUEL M. FEINBERG TESTAMENTARY TRUST and Edith Citron, Plaintiffs,

v.

Leigh CARTER, John C. Duncan, David L. Luke III, John D. Ong, David V. Ragone, Ian M. Ross, Patrick C. Ross, Thomas C. Simons, William P. Stiritz, G. Jack Tankersley, John L. Weinberg, Carl Icahn and Crane Associates, Defendants,

and

The B.F. Goodrich Company, Nominal Defendant.

No. 86 Civ. 0698 (JMW).

United States District Court, S.D. New York.

Jan. 15, 1987.

Klari Neuwelt, Wolf Popper Ross Wolf & Jones, Joseph H. Weiss, New York City, Barbara Wolf, Sachnoff Weaver & Rubenstein, Chicago, Ill., for plaintiffs.

Richard Reinthaler, White & Case, New York City, John M. Newman, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant Goodrich.

Steven Coploff, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, for defendant Icahn.

## OPINION

WALKER, District Judge:

### INTRODUCTION

The instant case arises out of the November 5, 1984 repurchase by Defendant The B.F. Goodrich Company ("Goodrich"), a New York corporation with its principal place of business in Ohio, of more than 1,000,000 shares of Goodrich common stock held by Defendant Carl Icahn ("Icahn"). Plaintiffs Samuel M. Feinberg Testamentary Trust ("Feinberg Trust"), an Illinois trust, and Edith Citron ("Citron"), a Florida resident, bring the instant action against the Goodrich board of directors who approved this stock repurchase ("Goodrich Directors"), Goodrich, Icahn, and Crane Associates, a New York limited partnership controlled and largely owned by Icahn, through which Icahn acquired his Goodrich shares. Plaintiffs' complaint, filed April 18, 1986, alleges federal claims against the Goodrich Directors under section 10(b) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, as well as Rule 14a–9, 17 C.F.R. § 240.14a–9, promulgated pursuant to section 14(a) of the 1934 act, 15 U.S.C. § 78n(a). In addition, the complaint alleges state law claims against the Goodrich Directors for waste and breach of fiduciary duty. Further, plaintiffs bring claims against Icahn and Crane Associates, alleging that these defendants aided and abetted the acts of federal securities fraud and breach of fiduciary duty committed by the Goodrich Directors in connection with the repurchase of stock from Icahn ("the Icahn repurchase").

Claiming the lack of an adequate remedy at law, plaintiffs seek to rescind the $41 million payment to Icahn. Plaintiffs also ask this Court to require that the Goodrich Directors reimburse Goodrich for all damages arising out of the Icahn repurchase, including the costs of a subsequent SEC investigation of this transaction, as well as plaintiffs' costs incurred in bringing the instant action. Further, plaintiffs seek to void the results of elections held at Goodrich's 1985 and 1986 annual meetings, including the reelection of directors which occurred at those meetings.

Defendants Goodrich Directors, Icahn, Crane Associates, and Goodrich move to dismiss each of the counts in plaintiffs' complaint, for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). Each defendant first argues that plaintiffs' failure to make demand on the Goodrich Directors requires dismissal of the instant action. This Court concludes that demand futility excuses plaintiffs' failure to make demand, and accordingly denies defendants' motion to dismiss plaintiffs' entire action on this ground.

The Goodrich Directors' motion to dismiss plaintiffs' claims brought under Rule 14a–9, promulgated pursuant to the 1934 Securities Act, is granted in part and denied in part. The Directors' motion to dismiss plaintiffs' section 10(b) action is granted. The Directors' motion to dismiss plain-

tiffs' state law action for breach of fiduciary duty and corporate waste is denied.

This Court grants the motion of Icahn and Crane Associates to dismiss plaintiffs' claim that these defendants aided and abetted the Goodrich Directors' federal securities fraud. This Court denies the motion of these defendants to dismiss plaintiff's claim that Icahn and Crane Associates aided and abetted the Goodrich Directors' breach of fiduciary duty.

This Court certifies for interlocutory appeal defendants' motion to dismiss for failure to make demand.

## STATEMENT OF FACTS

"On a motion to dismiss a complaint, all facts and inferences reasonably deductible therefrom are to be construed in favor of the plaintiff." *Budco, Inc. v. The Big Fights, Inc.,* 594 F.2d 900, 902 (2d Cir.1979) (per curiam). Applying this standard of review, the Court bases its legal analysis on the following factual record.

On October 25, 1984, Icahn informed the Goodrich Directors that he had acquired 1,171,700 shares, or 4.9 percent, of Goodrich's common stock. Icahn stated that he planned to acquire as much as 30 percent of Goodrich common stock by the end of October. Icahn asserted that after obtaining 30 percent of the outstanding shares, he would consider joining with management or other investors to purchase a controlling interest in Goodrich stock. If such a takeover failed to materialize, Icahn suggested that he might use the voting power accompanying his 30 percent stock ownership to obtain a seat on the Goodrich board of directors.

However, Icahn also made a firm offer to sell his initial holdings of more than 1 million shares of stock to Goodrich at $35 per share. Icahn's $35 per share offer was about 25 percent above the market price for shares of Goodrich common stock, which in late October 1984 stood at about $28 per share. Goodrich's acceptance thus would result in Icahn realizing about $8

million more than if he had sold his shares on the open market.

On November 5, 1984, the Goodrich Directors, after limited discussion on October 31, accepted Icahn's $35 per share offer. Goodrich financed the Icahn repurchase primarily through short-term loans. As part of the repurchase transaction, Icahn entered into a "standstill agreement," under which he agreed to abstain from acquiring any Goodrich stock for five years. Icahn also agreed that he would not disclose either the repurchase of his Goodrich shares or the standstill agreement, unless such a disclosure was required by law.

At the time of the Icahn repurchase, the Goodrich Directors included all the individuals other than Icahn named as defendants in the instant action: Leigh Carter ("Carter"), John C. Duncan ("Duncan"), David L. Luke III ("Luke"), John D. Ong ("Ong"), David V. Ragone ("Ragone"), Ian M. Ross ("Ian Ross"), Patrick C. Ross ("Patrick Ross"), Thomas C. Simons ("Simons"), William P. Stiritz ("Stiritz"), G. Jack Tankersley ("Tankersley"), and John L. Weinberg ("Weinberg").[1] All of these defendants remain members of the board of directors after their reelection in 1985 and 1986, with the exception of Stiritz, who did not seek reelection in 1985.

Defendant Ong served as Goodrich chairman of the board and chief executive officer in 1984, a position he continues to hold. Defendants Carter and Patrick Ross also hold positions as executive officers of Goodrich. During 1984, Ong received a salary of $556,676, while Carter and Patrick Ross each received about $378,000. The other directors received a 1984 base salary of $18,000, as well as an additional $5,500, paid at a rate of $500 for each of 11 board meetings the directors attended. All directors also received benefits in the form of a stock option program. A retiring Goodrich director who is 55 years old and has served on the board at least five years receives a pension equal to between 50%

and 100% of his salary, depending on his length of board service.

On November 9, 1984, Goodrich first announced the Icahn repurchase, describing the transaction only in the following press announcement:

The BFGoodrich Company announced today that it has acquired 1,171,700 shares of the Company's common stock. It is contemplated that the shares will be used to fund employee benefit and pension plans, for projected acquisitions and for other corporate purposes. From time to time, the Company purchases its shares for such purposes.

Goodrich did not disclose that the shares were purchased at a price significantly above the market rate, or that the shares were purchased from an individual stockholder. Although in the two weeks following the issuance of this press release Goodrich received inquiries from at least a dozen securities analysts and portfolio managers, Goodrich continued its policy of silence with respect to the details of the Icahn repurchase.

Similarly, Goodrich's Form 10–K for 1984, filed with the Securities and Exchange Commission ("SEC") on March 20, 1985, stated only that the company had repurchased 1,171,700 shares of common stock and had financed this purchase through an increase in debt. Like the earlier press release, the premium paid for the shares and the purchase of the more than 1,000,000 shares from an individual stockholder were not mentioned in the Form 10–K.

The first Goodrich public disclosure of specific details of the Icahn repurchase occurred on March 6, 1985 at a quarterly meeting with stock analysts, where Defendant Ong acknowledged that the company had paid $35 per share for the 1,171,100 shares repurchased from an individual shareholder. Ong admitted that the transaction could be characterized as "greenmail," and stated that the directors agreed to repurchase the shares because they did

---

**1.** The twelfth member of the Goodrich Board of Directors at the time of the stock repurchase from Icahn, O. Pendelton Thomas, died on February 8, 1985.

not wish to have Goodrich "put in play" for a possible takeover bid. In response to analysts' questions, Ong refused to identify Icahn as the individual who sold the stock to Goodrich.

On March 5, 1985, Goodrich filed its 1985 Proxy Statement with the SEC. The Proxy Statement included a proposed amendment to the company's certificate of incorporation, which the Goodrich Directors planned to submit for a shareholder vote at the company's annual meeting on April 15, 1985. Shareholder ratification of the amendment would produce two changes in the company's stock repurchase policy. First, the amendment would require the majority of the company's shareholders to approve any board of directors' payment of more than the market price in connection with a repurchase from an individual shareholder of 3 percent or more of the company's outstanding shares. Second, the amendment would require the approval by 80 percent of shareholders of stock repurchases from an individual holding 20 percent or more of the company's voting power, except where a majority of the company's disinterested directors had approved the transaction. This Proxy Statement included a general condemnation of "greenmail" transactions similar to the Icahn repurchase:

> The Board believes that no BFGoodrich shareholder should receive a disproportionate financial benefit, compared with other BFGoodrich shareholders, because the shareholder owns a significant number of shares....

> The Board does not view this proposal as an "anti-takeover" amendment. This proposal is not being recommended in response to any specific effort to obtain control of the Company, and the Company is not aware of any such effort....

> It is possible that adoption of the proposal might discourage purchases of large numbers of shares of the Company for the purpose of seeking "greenmail" and therefore might reduce trading activity and potential temporary price increases resulting from such purchases, to the possible disadvantage of present shareholders. The Board believes, however, that the disruptive effect of attempted "greenmail" is a more important concern and that benefits to the shareholders from the proposal more than offset this possible disadvantage.

The initial 1985 Proxy Statement did not mention the Icahn repurchase. However, a Supplemental Proxy Statement described many of the details of the repurchase. The Supplemental Proxy Statement was issued April 5, 1985, ten days before the stockholders' vote on the proposed greenmail amendment and the annual election of directors. Noting that all future stock repurchases which, like the Icahn repurchase, involved more than 3 percent of the company's outstanding shares could not be consummated solely by the board of directors, but would require the approval of the majority of shareholders if the proposed amendment was approved, the Supplemental Proxy Statement concluded: "Had the proposed amendment to the Certificate of Incorporation contained in the Proxy Statement been in effect, the Company could not have concluded this transaction without the affirmative vote of a majority of the outstanding shares of the Company's voting stock." However, the Supplemental Proxy Statement both failed to indicate that Icahn was the beneficiary of the 1984 repurchase and declined to mention his plan to purchase 30 percent of the outstanding shares of Goodrich stock. Goodrich shareholders adopted the amendment at the 1985 meeting, and reelected all members of the board who had approved the Icahn repurchase.

On January 15, 1986, the SEC began a formal investigation of the Icahn repurchase, filing an order instituting proceedings against Goodrich. The SEC charged that the Goodrich Directors' description of the Icahn repurchase in both the November 9, 1984 press release and the 10–K Form for 1984 was materially misleading. The SEC order also alleged that the 1985 Proxy Statement, which included the anti-greenmail amendment, was materially misleading. Specifically, the SEC alleged that the Goodrich representation regarding the amendments, which stated that "[t]his proposal is not being recommended in response to any specific effort to obtain con-

trol of the Company, and the Company is not aware of any such effort," was misleading "in that it did not disclose Icahn's recently communicated threat to purchase up to 30% of the company's shares and seek to join the board of directors, as well as the company's greenmail payment to him." The SEC also alleged that the more general condemnations of greenmail appearing in the Proxy Statement were misleading, because such statements appeared inconsistent with the company's repurchase of shares at a premium from Icahn, an event omitted from the initial Proxy Statement.

The SEC's investigation of Goodrich concluded with Goodrich agreeing to accept the findings in the SEC order instituting proceedings:

> [S]olely for the purpose of this proceeding or any other proceeding brought by or on behalf of the Commission or in which the Commission is a party and without admitting or denying the findings herein, BFGoodrich consents to the issuance of this Order Instituting Proceedings and Findings and Order herein.

Under the settlement, Goodrich also agreed to comply with various sections of the 1934 Securities and Exchange Act and rules promulgated under those sections.

As part of its 1986 Proxy Statement, Goodrich included a detailed description of two unspecified shareholders' derivative suits, including the instant action. The 1986 Proxy Statement also acknowledged the order instituting proceedings issued by the SEC, and noted that the SEC had accepted Goodrich's offer of settlement, "which ordered compliance with certain provisions of the Securities Exchange Act of 1934 and rules thereunder."

## DISCUSSION

### I. DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO MAKE DEMAND.

The Federal Rules of Civil Procedure require that in a derivative action "[t]he com-

plaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort." Fed. R.Civ.P. 23.1.[2] Since plaintiffs have failed to make demand on the Goodrich Directors, as required by Rule 23.1 in all cases where such a demand is not futile, defendants move to dismiss the instant complaint.

"The ... purpose of the 'demand' rule is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow directors the chance to occupy their normal status as conductors of the corporation's affairs." *Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 450 (2d Cir.1978); *Brody v. Chemical Bank*, 517 F.2d 932, 934 (2d Cir.1975). However, "[s]uch a demand is excused if the demand would be 'futile,' 'useless' or 'unavailing;' if the directors are 'antagonistic, adversely interested, or involved in the transaction attacked, a demand on them is presumptively futile and need not be made.'" *Kaster v. Modification Systems, Inc.*, 731 F.2d 1014, 1017 (2d Cir. 1984) (quoting *Cathedral Estates, Inc. v. Taft Realty Corp.*, 228 F.2d 85, 88 (2d Cir.1955)).

Plaintiffs oppose defendants' motion on the grounds of futility. "[T]he decision as to whether a plaintiffs' allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court." *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir.1983); *accord Kaster v. Modification Systems, Inc.*, 731 F.2d 1014, 1020 (2d Cir. 1984); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366, 393 (S.D.N.Y. 1973). On the facts of the instant case, this Court agrees that demand on defend-

---

**2.** Since the instant action involves both state and federal substantive claims, this Court must apply the federal law of demand, rather than

the corresponding New York state law on this issue. *See, e.g., Kaster v. Modification Systems, Inc.*, 731 F.2d 1014 (2d Cir.1984).

ant directors was in fact futile, as case law has defined this term, and thus must deny defendants' motion to dismiss for failure to make demand.

■ In considering arguments of demand futility on grounds of director interest, courts should seek to determine the presence of a business justification consistent with the challenged transaction. If a valid justification underlies a particular corporate decision, "the directors are left solely to their own honest and unselfish judgment, and if they exercise that judgment without fraud and free of conflicts of interest, they are not second-guessed by the courts." *Galef v. Alexander*, 615 F.2d 51, 57 (2d Cir.1980).

■ However, where corporate directors fail to show *any* valid business judgment underlying a challenged decision, courts will undertake a more critical review of a director's claim of disinterested decision-making. For example, in *Joy v. North*, 692 F.2d 880 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), the Second Circuit Court of Appeals reversed an order of summary judgment barring a shareholder's derivative suit where the defendant bank had made repeated loans to a company employing the son of the bank's controlling director, despite the obvious and escalating financial difficulties of the debtor company.[3] Finding no showing that any valid corporate purpose could have resulted in the challenged transactions, the *Joy* Court allowed the derivative action to proceed. *Id.* at 886, 894–96. *See also* Note, *Tender Offer Defensive Tactics and the Business Judgment Rule*, 58 N.Y.U.L.Rev. 621, 675 (1983).

■ The transaction challenged by plaintiffs in the instant case similarly is not supported by a showing of any underlying justification. The Defendant Directors posit no proper business justification for their purchase of Icahn's stock at $35 per share, when this stock possessed a market value of $28 per share. This repurchase cost Goodrich a total of $41 million, or about $8 million dollars more than a purchase of the same volume of stock in the open market. In return for this $8 million premium, Goodrich received nothing more than the 4.9 percent shareholder interest in Icahn's hands, his promise that he would not acquire shares of Goodrich stock for five years, and his promise of silence about the transaction.

Defendants have nowhere suggested how the elimination of a potentially major purchaser of Goodrich stock would improve the position of other holding Goodrich stock or otherwise serve the interests of the corporation. Specifically, they have pointed to no evidence indicating that elimination of Icahn as a shareholder would so improve the company's financial position to justify an $8 million premium. *Cf.* Note, *Greenmail: Targeted Stock Repurchases and the Management-Entrenchment Hypothesis*, 98 Harv.L.Rev. 1045, 1059 (1985) [hereinafter cited as Note, *Targeted Stock Repurchases* ] ("Given the ease with which directors can assert valid motives for making greenmail payments, plaintiffs in federal court will rarely be able to prove that management entrenchment is the sole or primary purpose of the stock repurchases.").

■ However, while the removal of Icahn as a potential Goodrich stock purchaser at an $8 million premium could only be accomplished at the expense of the individal shareholders, the same transaction would significantly benefit board members by securing the continued possession of

---

**3.** This Court recognizes that the procedural posture of the *Joy* case was different from that of the instant case. In *Joy*, plaintiff had made a demand for action on the defendant board of directors, but subsequently brought suit when the board rejected his demand. Conversely, plaintiffs in the instant case never made demand on the Goodrich board.

However, this distinction is largely irrelevant for purposes of analysis, since case law indicates that a similar standard of review applies to "demand refused" cases, such as *Joy*, and "demand excused" cases, such as the instant action. *See, e.g., Lewis v. Curtis*, 671 F.2d 779, 786 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

their director positions. For, if Icahn in fact had consummated his proposed takeover, a change in Goodrich management, including the board of directors, was possible. With such a turnover, board members would lose the benefits they receive as Goodrich directors. Not only did such directorships carry with them an intangible benefit of prestige, they included significant financial rewards as well. Each of the directors received more than $20,000 in annual salary, with Defendants Carter and Patrick Ross receiving more than $300,000, and Defendant Ong receiving more than $500,000. If any director served on the board for five years, he was entitled to receive a yearly pension equaling at least half of his compensation during his final year on the board. The directors' desire to retain their positions furnishes the requisite "adverse interest" indicating that any plaintiff demand on the Goodrich board of directors would have proven futile. *See Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 295 (W.D.N.Y. 1977); Note, *Targeted Stock Repurchases, supra,* at 1048 ("directors may face conflicts between their shareholders' preference that they focus narrowly on maximizing the value of the company's shares and their personal interest in enhancing their prestige and compensation....").

The adverse interest of the Goodrich directors is further indicated by their subsequent failure to disclose the Icahn transaction to the public and the shareholders. If the directors had believed the Icahn repurchase represented an appropriate expenditure of corporate funds, one would have expected the directors to announce the full details of the transaction to shareholders. Instead, the directors followed a continued policy of refusing to discuss or misrepresenting the transaction. This policy was manifested in the first public announcement of the Icahn repurchase in the November 9, 1984 press release, which mentioned not a word of the $8 million premium paid for Icahn's shares. The policy continued through Goodrich's March 5, 1985 Proxy Statement, which omitted any mention of the Icahn repurchase and stated

that Goodrich was "not aware" of any "specific effort" to take over the company, and was carried forward in the March 5, 1985 10–K filing and the March 6, 1985 analysts' meeting. In fact, the Goodrich Directors', having voted for the repurchase, were well aware of Icahn's takeover efforts, a point tacitly admitted in the April 5, 1985 Supplemental Proxy Statement which included a detailed description of the Icahn repurchase.

In *Lewis v. Curtis,* 671 F.2d 779 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982) the Third Circuit Court of Appeals found demand futility after reviewing a factual record strikingly similar to that presented in the instant case. *Curtis* involved another takeover attempt by Icahn, who had initiated a proxy contest in seeking a seat on the board of directors of the Hammermill Paper Company. In return for Icahn's agreement to abandon his quest for a seat on the board, Hammermill paid Icahn $750,000 which he would assertedly use to cover his costs in the proxy contest. In finding plaintiffs' failure to make demand to be excused as futile, the Third Circuit Court of Appeals wrote:

> The complaint here alleges that, not only did all the directors participate in and approve of the challenged activity, but the challenged activity is a self-interested transaction. It sets forth in detail a scheme, of which this transaction is alleged to be a part, furthering the directors' interest in perpetuating their control of Hammermill. When a complaint alleges, as this amended complaint does, that all the directors participated in and approved of a self-interested transaction, and sets forth in detail facts showing that the directors are indeed interested, any demand must be presumed futile.

*Id.* at 787.

Defendants rely heavily on *Lewis v. Graves,* 701 F.2d 245 (2d Cir.1983), in arguing that plaintiffs have not demonstrated demand futility. However, the derivative suit dismissed in *Graves* was based on allegations far different from those raised in the instant case. The plaintiff in *Graves*

alleged that the defendant directors had engaged in a merger to perpetuate their tenure as board members. However, the *Graves* complaint, unlike the complaint filed in the instant case, included no specific facts supporting its conclusory allegation that the self-interest of board members resulted in their decision to approve the merger. The Court of Appeals noted in *Graves* that its decision was limited to the deficiencies of the complaint filed in that case:

> While improper maintenance of a corporate directorship may in some cases provide the foundation for a claim of bias or self-interest sufficient to excuse demand, the allegations of plaintiff's complaint do not indicate in what way McDermott's acquisition of Babcock ensured the positions of the defendant directors. In fact, plaintiff points to nothing from which we can even speculate that the Babcock acquisition might have been approved by the McDermott board in order to entrench the directors' positions on that board.

*Id.* at 250. Conversely, the detailed factual background provided by plaintiffs in the instant case provides the necessary "logical or factual nexus between the transaction and the asserted entrenchment" to excuse plaintiffs' failure to make demand as futile. *Id.*

Defendants' reliance on *Brayton v. Ostrau*, 561 F.Supp. 156, 165 (S.D.N.Y.1983) is even more seriously misplaced. The *Brayton* decision analyzed the issue of the defendant directors' adverse interest solely in relation to plaintiffs' substantive federal claims of securities fraud. *Id.* at 165. The issue of demand futility was neither raised nor discussed in *Brayton,* and this decision thus has little relevance to the instant case.

In conclusion, defendants blandly argue that a showing of director entrenchment as the sole motive for a challenged corporate decision is irrelevant to the issue of demand futility, since "director decisions can be taken with an eye toward sustaining sufficient shareholder approval to be reelected at the next shareholder meeting."

This Court cannot adopt this cynical view of director decisions. In proper corporate governance, these decision will typically be aimed at improving corporate profitability and responsibility. The Court views the instant case as an atypical situation where the self-interest of corporate directors may well have dominated other considerations.

For the reasons set forth above, this Court finds that any plaintiff attempt to make demand in the instant case would prove futile. Defendants' motion to dismiss for failure to make demand is denied.

## II. GOODRICH DIRECTORS' MOTION TO DISMISS PLAINTIFFS' SECTION 14(a) CLAIMS.

Plaintiffs claim that Proxy Statements issued by the Goodrich Directors in 1985 and 1986 violate Rule 14a–9, 17 C.F.R. § 240.14a–9, promulgated pursuant to section 14(a) of the 1934 Securities and Exchange Act, 15 U.S.C. § 78n(a). Rule 14a–9 prohibits any Proxy Statement which is

> false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

The Supreme Court has developed a general definition of materiality for Rule 14a–9 purposes: "An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). To maintain an action under Rule 14a–9, there is "no need to demonstrate that the alleged defect in the proxy statement actually had a decisive effect on the voting." *Id.* at 444, 96 S.Ct. at 2130; *accord Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

## A. *The 1985 Proxy Statements.*

Plaintiffs first argue that Defendant Goodrich Directors violated Rule 14a–9 when they issued two 1985 Proxy Statements discussing defendants' proposed anti-greenmail amendment, which Goodrich shareholders eventually adopted. The first Goodrich Proxy Statement, filed with the SEC on March 5, 1979, contained no mention of the Icahn repurchase. In fact, this Proxy Statement suggested that no such repurchase had occurred, and thus stated: "This proposal is not being recommended in response to any specific effort to obtain control of the Company, and the Company is not aware of any such effort...." The March 5 Proxy Statement also included a general condemnation of greenmail, stating that "no BFGoodrich shareholder should receive a disproportionate financial benefit, compared with other BFGoodrich shareholders."

On April 5, 1985, Goodrich issued a Supplemental Proxy Statement which discussed many details of the Icahn repurchase. However, this Supplemental Proxy Statement failed to mention Icahn's plan to purchase 30 percent of Goodrich stock and possibly take over the company. Also, the April 5 Supplemental Proxy Statement failed to name Icahn as the individual benefitting from the stock repurchase. At Goodrich's April 15, 1985 annual meeting, shareholders reelected all members of the board of directors seeking additional terms and approved the anti-greenmail amendment.

Plaintiffs argue that the inaccuracies and omissions in the 1985 Proxy Statements affected shareholder voting decisions. Plaintiffs attack the reelection of the Goodrich Directors, arguing that shareholders might have rejected some or all of these candidates if the initial Proxy Statement had included a complete discussion of the Icahn repurchase. The basis for plaintiffs' argument that disclosure of the Icahn repurchase might have affected shareholder votes on the anti-greenmail amendment is less clear. Plaintiffs apparently believe that shareholders might have been unwilling to adopt the anti-greenmail amendment if Goodrich had disclosed that the availability of greenmail payments might encourage individuals such as Icahn to accumulate large blocks of Goodrich stock, a process which could culminate in a takeover attempt and an increase in the market price of Goodrich stock.

"[T]he difficult question of materiality should not ordinarily be disposed of on a Rule 12(b)(6) motion." *Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 707 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978); *accord Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654–55 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980). However, defendants bring such a motion to dismiss plaintiffs' Rule 14a–9 claim, arguing primarily that the 1985 Supplementary Proxy Statement provided a complete disclosure of the Icahn repurchase.

This Court cannot agree that the issuance of even the most complete and accurate Supplemental Proxy Statement, as defendant describes its April 5 document, would inherently cure all defects in the initial Proxy Statement. In assessing a Rule 14a–9 claim, this Court must review the " 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Where an initial Proxy Statement is fraught with misrepresentations and serious omissions, it may be impossible to cure this prejudice through the filing of a Supplemental Proxy Statement. *See Newgard v. Electro-Nucleonics, Inc.*, 1976 Fed.Sec.L.Rep. (CCH) ¶ 95,-805 (S.D.N.Y.1976). The value of a Supplemental Proxy Statement is particularly questionable where the statement is issued shortly before a shareholders' vote, giving voters limited time to evaluate the corrected statements. *See Camelot Industries Corp. v. Vista Resources, Inc.*, 535 F.Supp. 1174, 1184–85 (S.D.N.Y.1982) (ten day delay in shareholder meeting necessitated after Supplemental Proxy Statement correcting errors in initial statement was filed about 20 days prior to meeting); *Kenne-*

*cott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 968 (S.D.N.Y.1978), *aff'd in part, rev'd in part on other grounds*, 584 F.2d 1195 (2d Cir.1978) ("While a violation might be cured by a resolicitation of new Proxy Statements, that course is not warranted here because of the imminence of the annual meeting."). In the instant case, the Supplemental Proxy Statement was issued only ten days prior to the casting of votes on the election of Goodrich Directors and the anti-greenmail amendment. Accordingly, this Court will examine "the total mix of information made available" to shareholders, beginning with the Proxy Statement initially submitted by defendants.

■ In reviewing the initial March 5 Proxy Statement, this Court finds that the initial statement both contained material facts which were "false and misleading," and omitted other material facts. The March 5 assertion that the antigreenmail amendment was "not being recommended in response to any specific effort to obtain control of the Company. ..." is at best seriously misleading. The inaccurate quality of this March 5 statement was all but admitted in the Supplemental Proxy Statement, which in discussing the Icahn repurchase, stated: "Had the proposed amendment to the Certificate of Incorporation contained in the Proxy Statement been in effect, the Company could not have concluded this transaction without the affirmative vote of a majority of the outstanding shares of the Company's voting stock."

The facts omitted from the March 5 Proxy Statement appear even more serious than the facts misrepresented. Specifically, while explicitly raising the issue of stock repurchases at infalted prices in the proposed anti-greenmail amendment, the March 5 statement was wholly devoid of any mention of the Icahn repurchase. A discussion of the Icahn repurchase would have revealed that the Goodrich Directors' pious invective against greenmail was inconsistent with the defendants' payment of greenmail just a few months before. *See Halpern v. Armstrong*, 491 F.Supp. 365,

379 (S.D.N.Y.1980) (Proxy Statement violated Rule 14a–9 by incorrectly describing amendment which changed stock option program to directors' benefit as "clarifying" prior policy). The explicit recognition of such conduct could hardly have advanced the reelection efforts of the Goodrich directors. *See Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 655 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980) (allegation of bribes and kickbacks to directors "would be material to the shareholders in deciding whether to re-elect directors," warranting reversal of lower court's dismissal of Rule 14a–9 claims).

In short, the inaccuracies which characterized the initial Proxy Statement appear similar to a Proxy Statement which the Second Circuit Court of Appeals viewed as constituting a sufficient basis for a Rule 14a–9 claim. In *Maldonado v. Flynn*, 597 F.2d 789 (2d Cir.1979), the court considered a Proxy Statement submitted in connection with the reelection bid of several defendant directors. The *Maldonado* Proxy Statement failed to note that directors were "possessed of inside information to the effect that an imminent tender offer would sharply increase the market value of Zapata's shares" or that these directors had accelerated the effective date of their options for purchasing the corporation's stock "thus enabling Zapata's six senior officers to enlarge their profit substantially...." With respect to loans provided by the corporation to certain *Maldonado* defendant directors, which enabled the defendants to maximize their insider purchases, the Proxy Statement stated only that: "The purpose of the ... loan arrangements was to enable [the] officers to exercise their options at a time when ... the Federal income tax liability resulting from [the officers' option] exercise ... would be minimized." *Id.* at 797. In reversing a district court decision dismissing plaintiffs' claims, the Court of Appeals stated of the *Maldonado* Proxy Statement: "At best this statement was a half-truth and quite misleading." *Id.*

Despite the foregoing shortcomings of the initial Goodrich Proxy Statement, in

assessing the "total mix of information" provided prior to the 1985 meeting, this Court must consider, together with the initial Proxy Statement, the Supplemental Proxy Statement filed with the SEC on April 5, 1985. While the extent and accuracy of the disclosure in the supplemental statement was significant, this Court cannot find that the supplemental statement cured the defects in the initial statement. First, the Supplemental Proxy Statement omitted any mention of Icahn's plan to acquire 30 percent of the Goodrich stock and arrange a takeover of the company. A disclosure of these facts would have helped to inform shareholders that the Icahn repurchase was a classic greenmail transaction, negating any suggestion produced by the initial Proxy Statement's condemnation of greenmail that Goodrich had not engaged in such anti-takeover repurchases. *See Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1120–21 (9th Cir.1982), *cert. denied*, 460 U.S. 1029, 103 S.Ct. 1281, 75 L.Ed.2d 501 (1983) (failure to disclose prior takeover attempt in Proxy Statements issued in connection with anti-takeover proposal stated cause of action under Rule 14a–9); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F.Supp. 372, 383 (D.Del.1983) (Proxy Statements incorrectly suggesting that merger was negotiated at arms length stated cause of action under Rule 14a–9). Second, this Court finds that the issuance of the Supplemental Proxy Statement just ten days before the annual meeting limited the curative effect of the supplemental statement.

Defendants seek to rely on *Rodman v. Grant Foundation*, 608 F.2d 64 (2d Cir. 1979) in support of their motion to dismiss. *Rodman* did involve certain facts in common with the instant case: The *Rodman* plaintiff challenged a repurchase transaction, designed to prevent "company stock [from] falling into the unfriendly hands of 'money raiders.'" *Id.* at 71. However, one crucial fact distinguishes *Rodman* from the instant case: Information on the repurchase "was set out in a logical and comprehensive manner in ... [two] proxy statements and was not 'buried' by being dispersed among or immersed in irrelevant data." *Id.* at 70. Defendants in the instant case did not set out relevant information in a "logical and comprehensive manner," nor did they even "bury" it in "irrelevant data." Rather, defendants apparently engaged in the much more disturbing conduct of either omitting relevant material facts or misrepresenting them outright.

Of course, plaintiffs' claim of Rule 14a–9 violations would receive a far different review at trial than on defendants' motion to dismiss. "It may develop that plaintiffs cannot demonstrate to the trier of fact that the reasonable shareholder would have been misled. It may develop ... that the plaintiffs actually knew or could not have cared less about the very facts that they claim were misrepresented." *Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 707 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978). However, this Court cannot find at this pleading stage that, as a matter of law, shareholders were not misled by the 1985 Proxy Statements.

The Goodrich Directors' motion to dismiss plaintiffs' Rule 14a–9 claim based on the 1985 Proxy Statements is denied.

#### B. *The 1986 Proxy Statements.*

Plaintiffs' allegation that the 1986 Proxy Statement violated Rule 14a–9 stands on a much weaker footing than their claim with respect to the 1985 Proxy Statements. Unlike the initial 1985 Proxy Statement, plaintiffs do not allege that defendants misrepresented or omitted material facts in the 1986 Proxy Statement. Instead, plaintiffs assert that defendants' presentation of admittedly accurate facts misled shareholders. As stated in plaintiffs' opposition papers:

> The omission of reasons for the S.E.C.'s inaction, juxtaposed with the disclosure of this lawsuit, is unfair and misleading as to the nature of the greenmail.... At the very least the materiality of the omission creates a question of fact which cannot be resolved on a motion for summary judgment.

■ This Court cannot find the presence of the material fact issue which plaintiffs

suggest is raised by the 1986 Proxy Statement. This statement included an accurate discussion of the SEC's initiation of action against Goodrich and the resolution of that action. Plaintiffs also fail to show that the statement contained any material misrepresentations or omissions in describing this lawsuit or the other derivative action referred to in the Proxy Statement.

Plaintiffs' argument amounts to a claim that a facially accurate Proxy Statement somehow misled its readers. Such a claim cannot form the basis for a Rule 14a–9 action. In composing a Proxy Statement, "it is not deceptive for corporate insiders to fail to characterize the transaction or their own role with pejorative nouns or adjectives or fail to draw adverse inferences from the facts disclosed." *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278, 1290 (N.D.Ill.1981). In short, a Proxy Statement does not violate Rule 14a–9 if the "information was set out in a logical and comprehensive manner." *Rodman v. Grant Foundation*, 608 F.2d 64, 70 (2d Cir.1979). "Fair accuracy, not perfection is the appropriate standard." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir.1978).

This Court finds that such "fair accuracy" characterized defendants' 1986 Proxy Statement and accordingly dismisses plaintiffs' Rule 14a–9 claim with respect to this statement.[4]

### III. DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECTION 10(b) CLAIMS.

#### A. *Plaintiffs' Claim Against the Goodrich Directors.*

 Plaintiffs argue that the Defendant Goodrich Directors' misstatements and omissions with respect to the Icahn repurchase constitute securities fraud, in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The defendant directors argue that this Court must dismiss plaintiffs' federal securities fraud claim because, among other things, plaintiffs have failed to plead the existence of any fraudulent act or statement which caused Goodrich to repurchase the shares from Icahn. Finding defendants' argument on this point conclusive, the Court dismisses plaintiffs' section 10(b) claims against the Goodrich Directors.

 Section 10(b) of the 1934 Securities Act prohibits the use "in connection with the purchase or sale of any security ... any manipulative or deceptive device...." 15 U.S.C. § 78j(b). Where a "manipulative or deceptive device" is used to accomplish the sale of securities to a corporation, that corporation, like the individual shareholder, may seek relief under section 10(b). *Goldberg v. Meridor*, 567 F.2d 209, 217–19 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

 Plaintiffs in the instant case have failed to identify any deceptive statements which resulted in Goodrich's decision to undertake the Icahn repurchase. Case law has established that plaintiffs bringing suit under section 10(b) must show that deceptive acts were a "significant contributing cause" of a decision to buy or sell securities. *Panzirer v. Wolf*, 663 F.2d 365, 367 (2d Cir.1981), *vacated on other grounds*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Wilson v. Commontech Telecom-*

---

**4.** Defendants cite some authority that the reelection of directors after the issuance of a valid Proxy Statement prohibits a plaintiff from challenging the previous election of these directors, even if the Proxy Statement issued just prior to the earlier election violated Rule 14a–9. *See, e.g., Maldonado v. Flynn*, 597 F.2d 789, 797 n. 10 (2d Cir.1979); *Sanders v. Thrall Car Manufacturing Co.*, 582 F.Supp. 945, 955 (S.D.N.Y.1983). In short, defendants' argue that the election of the defendant directors in the valid 1986 election bars plaintiffs' 14a–9 claim based on the 1985 Proxy Statements. However, since plaintiffs challenge both the 1985 election of the directors at the shareholders annual meeting and the passage of the anti-greenmail amendment at this meeting, the validity of the 1986 Proxy Statement cannot bar plaintiffs' action based on the 1985 Proxy Statements.

*munications Corp.*, 648 F.2d 88, 92 (2d Cir.1981). Plaintiffs have produced no evidence of any false or deceptive conduct on the part of Icahn. In fact, plaintiffs' complaint makes no showing that Icahn did not deliver to Goodrich exactly what he promised in return for the $8 million stock premium: A binding representation that he would not attempt to take over Goodrich for five years after payment of the premium.

▮ The complaint makes extensive allegations of wrongful conduct on the part of the Goodrich Directors. However, each of the alleged misrepresentations or omissions attributed to the directors occurred after, rather than prior to the Icahn repurchase. Where the only manipulative or deceptive acts identified in a complaint occur after a challenged securities purchase or sale, a court must dismiss the complaint as failing to state a cause of action for federal securities fraud. *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1228–29 (S.D.N.Y.1982); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1148 (S.D.N.Y.1979); *Halperin v. Edwards and Hanly*, 430 F.Supp. 121, 124–25 (E.D.N.Y.1977).

Plaintiffs provide no response to defendants' lack of causation argument. The Defendant Goodrich Directors' motion to dismiss plaintiffs' federal securities claims is thus granted. This Court need not reach the additional grounds offered by defendants in support of their motion to dismiss.

B. *Plaintiffs' Claim Against Icahn and Crane Associates.*

▮ Defendants Icahn and Crane Associates move to dismiss plaintiffs' claim, which alleges that these defendants aided and abetted the federal securities fraud perpetrated by the Goodrich Directors. In light of this Court's dismissal of plaintiffs' principal section 10(b) action against the Goodrich Directors, this Court also must dismiss the related aiding and abetting action brought against Icahn and Crane Associates. *Reingold v. Deloitte Haskins & Sells*, 599 F.Supp. 1241, 1270 (S.D.N.Y. 1984); *IIT v. Cornfeld*, 462 F.Supp. 209,

224 (S.D.N.Y.1978); *aff'd in part, rev'd in part on other grounds*, 619 F.2d 909 (2d Cir.1980) ("[w]ithout primary liability, there can be no aiding and abetting liability"); *Morgan v. Prudential Group, Inc.*, 81 F.R.D. 418, 425 n. 6 (S.D.N.Y.1978).

Accordingly, the motion of Defendants Icahn and Crane to dismiss plaintiffs' securities fraud claims is granted.

## IV. BREACH OF FIDUCIARY DUTY AND CORPORATE WASTE

A. *Goodrich Directors' Motion to Dismiss.*

▮ Plaintiffs also charge that the Goodrich Directors' payment of the $41 million to Icahn constituted a breach of fiduciary duty and corporate waste. This claim is based on the New York state law principle that "[b]ecause the power to manage the affairs of a corporation is vested in the directors and majority shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare.' ... When a breach of fiduciary duty occurs, that action will be considered unlawful and the aggrieved shareholder may be entitled to equitable relief...." *Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 568, 473 N.E.2d 19, 25, 483 N.Y.S.2d 667, 673–74 (1984) (quoting in part *Leibert v. Clapp*, 13 N.Y.2d 313, 317, 196 N.E.2d 540, 542, 247 N.Y.S.2d 102, 105 (1963)). Defendants move to dismiss, arguing that plaintiffs' pleading, read in the light most favorable to plaintiffs, cannot support an action for breach of fiduciary duty. Settled case law compels the conclusion that defendants' position is without merit, and accordingly their motion to dismiss is denied.

As the New York Court of Appeals has noted: "Directors undertake affirmative duties of due care and diligence to a corporation and its shareholders in addition to their obligation to avoid self-dealing." *Barr v. Wackman*, 36 N.Y.2d 371, 380, 329 N.E.2d 180, 187, 368 N.Y.S.2d 497, 507 (1975). "A director's obligation to protect the financial interests of the corporation ... may not be compromised by a compet-

ing interest in other legitimate corporate purposes, such as fending off a hostile takeover bid." *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 278 (2d Cir.1986) (applying New York law). In addition, "such transactions having the capacity to secure management justify a shift in the burden of proof, depriving the defendants of the more extreme protection of the business judgment rule." *Danaher Corp. v. Chicago Pneumatic Tool Co.,* 633 F.Supp. 1066, 1070 (S.D.N.Y.1986).

The Second Circuit Court of Appeals decision in *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255 (2d Cir.1984) demonstrates that plaintiffs' pleadings establish a viable claim for breach of fiduciary duty under New York law. In *Norlin,* corporate directors transferred a large block of new stock to an employee benefit plan, in order to hinder a takeover attempt. As in the instant case, the *Norlin* directors gave no justification for the transfer, other than preventing the takeover. *Id.* at 259. Holding that the complaint alleged a *prima facie* case of breach of fiduciary duty, the *Norlin* court wrote:

> The precipitous timing of the share issuances ... give rise to a strong inference that the purpose of the transaction is not to benefit the employees but rather to solidify management's control of the company. This is buttressed by the fact that the board offered its shareholders no rationale for the transfers other than its determination to oppose, at all costs, the threat to the company that Piezo's acquisition ostensibly represented.

*Id.* at 265. *Cf. Danaher Corp v. Chicago Pneumatic Tool Co.,* 633 F.Supp. 1066, 1070–71 (S.D.N.Y.1986) (defendant directors met burden of proving that that funding of employee benefit plan with one million shares of stock was "entered into in good faith for the corporate benefit and did not have as a primary or dominant motivation the preservation of control in management").

Plaintiffs' complaint includes even stronger allegations of breach of fiduciary duty than those found sufficient in *Norlin.*

While the *Norlin* directors could offer the arguable, if implausible, explanation that the issuance of the employee benefit plan was designed as an incentive to improve productivity and profitability, the directors in the instant case could offer no such justification for the Icahn repurchase. This transaction resulted in an $8 million loss to Goodrich, with no corresponding benefit to Goodrich shareholders. The only beneficiaries under the repurchase, other than Icahn, were the Goodrich directors, who insured their continued control of the company.

This Court's interpretation that plaintiffs have pleaded an action for breach of fiduciary duty under New York law receives further support from the law of other jurisdictions. For example, in *Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1019 (S.D.N.Y.1984), this Court, applying Missouri law, described "[r]etention of control" as an "illegitimate purpose" which is "often a motive for directors' opposition to unsolicited takeover bids." *Id.* at 1018. Similarly, a California state appellate court held that the payment of greenmail constituted a breach of fiduciary duty. *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 127, 214 Cal.Rptr. 177, 182 (1985) ("While there may be many reasons why corporate directors would ... repurchase the corporation's shares, the naked desire to retain their position of power and control over the corporation is not one of them.").

In moving to dismiss plaintiffs' claim, defendants rely heavily on two New York Supreme Court decisions, *Karfunkel v. US-LIFE Corp.,* 116 Misc. 2d 841, 455 N.Y.S.2d 937 (1982), *aff'd,* 98 A.D.2d 628, 469 N.Y. S.2d 1020 (1st Dep't 1983) and *Lewis v. Kurshan,* N.Y.L.J., Dec. 1, 1983, p. 6, col. 4 (Sup.Ct.N.Y.Co.). The *Karfunkel* decision dismissed a claim alleging a breach of fiduciary duty resulting from the repurchase of stock at an above-market price. However, the apparent similarity between *Karfunkel* and the instant case is far outweighed by the differences in these two cases. First, the beneficiary of the *Karfunkel* repurchase, unlike Icahn in the instant case, had

shown no inclination to seek control of the corporation repurchasing his stock, a fact which negated plaintiff's suggestion that the *Karfunkel* repurchase was designed solely to protect the positions held by directors and management. *Karfunkel v. USLIFE Corp., supra,* 116 Misc. 2d at 841, 455 N.Y.S.2d at 941. More importantly, the *Karfunkel* directors produced at least one legitimate justification for the repurchase: a need to increase the extremely small number of shares held in the corporate treasury. *Id.* 445 N.Y.S.2d at 941. No such justification is offered in the instant case.

In *Lewis v. Kurshan, supra,* a state trial court dismissed a plaintiff's breach of fiduciary duty action, holding: "A purchase can legitimately be made to remove the threat of a corporate raider whose goals would be detrimental to those of the corporation." *Id.* at 6. This Court first notes that the facts of *Kurshan* appear distinguishable from those alleged in the instant case. Defendants have produced no showing here that Icahn's goals "would be detrimental to those of the corporation." The possibility of a change in management personnel, of itself, does not rise to the level of such a showing.

However, this Court also views *Kurshan* as of questionable value as precedent. In addition to the distinguishable *Karfunkel* decision, *Kurshan* relied solely on *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), a Seventh Circuit opinion interpreting Delaware, rather than New York law, and which the Seventh Circuit has described in a subsequent opinion as of questionable validity. *See Dynamics Corporation of America v. CTS Corp.,* 794 F.2d 250, 258 (7th Cir.1986). Accordingly, the Court views the two-page opinion in *Kurshan* as inconsistent with the weight of New York authority and declines to follow this decision.

For the reasons set forth above, defendants' motion to dismiss plaintiffs' state law claim for breach of fiduciary duty and corporate waste is denied.

### B. *Motion to Dismiss of Icahn and Crane Associates.*

Plaintiffs also have brought state law claims against Icahn and Crane Associates, alleging that these defendants acted to aid and abet the Goodrich Directors' breach of fiduciary duty. Icahn and Crane Associates move to dismiss plaintiffs' aiding and abetting claim.

New York law clearly provides that "those who conspire with and induce directors to breach their fiduciary duties are liable for any damages which ensue." *Binon v. Boel,* 271 A.D. 505, 510, 66 N.Y.S.2d 425, 429 (1st Dep't 1946), *aff'd,* 297 N.Y. 528, 74 N.E.2d 466 (1947); *accord Superintendent of Insurance v. Freedman,* 443 F.Supp. 628, 638–39 (S.D.N.Y.1977), *aff'd mem.,* 594 F.2d 852 (2d Cir.1978). A plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show: "(1) the existence of a ... violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *ITT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (citations omitted). While cases such as *Cornfeld* have developed this three-part aiding and abetting test primarily in the context of federal securities fraud actions, the test is equally applicable to claims alleging the aiding and abetting of corporate waste or a breach of fidcuiary duty. *See Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1027 (S.D.N.Y. 1984).

To prove that a defendant aided and abetted a breach of fiduciary duty, a plaintiff must produce evidence of the defendant's "knowledge not only of the unfairness and unreasonableness of the instant transaction, but also of facts and circumstances demonstrating that the ... [defendant] acted in furtherance of ... [his] own self-interest." *Id.* at 1027. "Actual knowledge, not mere notice or unreasonable unawareness, is therefore essential."

*Id.; accord Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1290 (S.D.N.Y. 1979), *aff'd mem.,* 636 F.2d 1202 (2d Cir. 1980).

New York case law has yet to consider the precise question raised by the instant motion to dismiss: Whether a minority shareholder who sells his stock to the issuing corporation at a substantial premium may be held liable for aiding and abetting a breach of fiduciary duty. A recent Appellate Division decision, *Traub v. Barber,* 86 A.D.2d 806, 452 N.Y.S.2d 575 (1st Dep't 1982), held that plaintiff stated a cause of action for aiding and abetting a breach of fiduciary duty where the defendant stockholder had sold his shares in a repurchase transaction for a price $8 above the market rate. *See Traub v. Barber,* No. 25341–80 slip op. at 4 (Sup.Ct.N.Y.Co.1981), *aff'd,* 86 A.D.2d 806, 452 N.Y.S.2d 575 (1st Dep't 1982). However, the *Traub* court conditioning its holding on the fact that the seller held a " 'controlling' interest" of 20.6% of the purchasing corporation's stock, and that ownership of this controlling interest established a fiduciary duty to minority shareholders of the purchasing corporation. *Traub v. Barber, supra,* 86 A.D.2d at 806, 452 N.Y.S.2d at 575. In the instant case, although Icahn announced an intent to acquire 30 percent of Goodrich's outstanding shares, a possible controlling interest, his 4.9 percent ownership of Goodrich stock at the time of the repurchase falls short of such a controlling interest.

■■■ However, decisions applying the law of other states provide ample authority for the proposition that under New York law outsiders, whatever their interest, who attempt to reap benefits through their participation in unconscionable stock transactions may be held liable for aiding and abetting a breach of fiduciary duty. For example, in *Box v. Northrop Corp.,* 459 F.Supp. 540 (S.D.N.Y.1978), *aff'd mem.,* 598 F.2d 609 (2d Cir.1979), this court, applying Maryland law, held that plaintiff, a minority shareholder stated a cause of action against corporate creditors who aided and abetted an alleged breach of fiduciary duty committed by corporate directors. Seeking to sell the company in which plaintiff held stock, the creditors and directors sought to purchase plaintiff's stock. "When these attempts failed, Fuller [the corporation] was recapitalized in such a way that Box's [plaintiff's] minority ownership of Fuller plummeted from 20% to .258%." *Id.* at 548.

Plaintiffs' argument receives additional support from a recent decision by a California state appellate court, *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 214 Cal.Rptr. 177 (1985). In *Heckmann,* plaintiffs challenged a repurchase, where the defendant directors of Walt Disney Productions repurchased 12 percent of their company's stock at a price of more than $13 per share above the market rate, after the beneficiaries of the repurchase, "The Steinberg Group," had threatened to acquire a controlling interest in the company. The *Heckmann* court found that plaintiffs stated not only a cause of action for breach of fiduciary duty against the defendant directors, but also an aiding and abetting action against The Steinberg Group.

> If the Disney directors breached their fiduciary duty to the stockholders, the Steinberg Group could be held jointly liable as an aider and abettor. The Steinberg Group knew that it was reselling its stock at a price considerably above market value to enable the Disney directors to retain control of the corporation. It knew or should have known Disney was borrowing the $325 million purchase price. From its previous dealings with Disney ... it knew the increased debt load would adversely affect Disney's credit rating and the price of its stock. If it were an active participant in the breach of duty and reaped the benefit, it cannot disclaim the burden.

*Id.* at 127, 214 Cal.Rptr. at 182–83.

Similarly, in the instant case Icahn may be held to have known that the directors' payment of the premium unquestionably would harm Goodrich and its shareholders, that such a payment would thus constitute a breach of the Goodrich Directors' fiduci-

ary duty, and that despite this knowledge he assisted therein for personal gain. The fact that Icahn already has participated as a defendant in at least one derivative action challenging his receipt of funds from a takeover target suggests that Icahn was not completely naive concerning the legal implications for the Goodrich Directors of his repurchase proposal. *See Lewis v. Curtis*, 671 F.2d 779 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

However, at this point in the instant litigation, the Court and plaintiffs may only speculate as to Icahn's knowledge based upon his previous experience with other acquisitions and his role in negotiations leading to the challenged repurchase. The New York Court of Appeals has identified shareholders' derivative suits, such as the instant case, as actions where "almost all possible evidentiary data with respect to the areas of permissible inquiry.... [are] within the exclusive possession of defendants." *Parkoff v. General Telephone & Electronics*, 53 N.Y.2d 412, 417, 425 N.E.2d 820, 822, 442 N.Y.S.2d 432, 434 (1981). A decision which "ends a derivative action at the threshold, before the plaintiff has been afforded the opportunity of pretrial discovery and examintion before trial, should not be the means of foreclosing a nonfrivolous action." *Auerbach v. Bennett*, 64 A.D.2d 98, 107–08, 408 N.Y.S.2d 83, 88 (2d Dep't 1978), *modified*, 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (1979).

Finding that plaintiffs have pleaded a nonfrivolous action, this Court refuses to interfere with plaintiffs' discovery of all relevant facts which may provide evidence as to Icahn's role in aiding and abetting a breach of fiduciary duty. Accordingly, this Court denies the motion of Icahn and Crane Associates to dismiss plaintiffs' claims on that score.

## V. INTERLOCUTORY APPEAL

█ The Federal Rules of Civil Procedure allows interlocutory appeals where a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such an order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C.A. 1292(b) (West Supp.1986). The decision as to whether a question is the appropriate subject of an interlocutory appeal falls within the discretion of the district court. *Wm. Passalacqua Builders v. Resnick Developers South, Inc.*, 611 F.Supp. 281, 284–85 (S.D.N.Y.1985). However, this Court is also aware that "[t]he procedure set forth in Section 1292(b) should be used sparingly and only in exceptional cases." *Inmates of Unit 14 v. Rebideau*, 102 F.R.D. 122, 129 (N.D.N.Y.1984); *accord Ratner v. Chemical Bank New York Trust Co.*, 309 F.Supp. 983, 988 (S.D.N.Y.1969).

█ This Court believes that the first issue considered in this opinion, whether plaintiffs have shown adverse interest on the part of the Goodrich Directors, excusing their failure to make demand, presents such an exceptional question. The papers filed by plaintiffs and defendants, all of which rely heavily on divergent law from courts outside this circuit, indicate the existence of a "substantial ground for a difference of opinion" on this issue. In addition, authorizing an interlocutory appeal on this issue could "materially advance the ultimate termination of this litigation," since a reversal by the Court of Appeals of this Court's holding on the issue would result in the dismissal of all of plaintiffs' claims in this case: claims which may well result in costly and time-consuming discovery and a complex and lengthy trial if this Court's opinion remains in force.

Accordingly, this Court certifies a Section 1292(b) interlocutory appeal on the issue of whether plaintiffs' failure to make demand is excused for reasons of futility.

### CONCLUSION

Defendants' motion to dismiss plaintiffs' derivative action for failure to make demand is denied. The Goodrich Directors' motion to dismiss plaintiffs' Rule 14a–9 claims is granted in part and denied in part. The directors' motion to dismiss plaintiffs' section 10(b) claims is granted. The directors' motion to dismiss plaintiffs' state law claims is denied.

The Court grants the motion of Defendants Icahn and Crane Associates to dismiss plaintiffs' claims that these defendants aided and abetted federal securities law violations. Defendants' motion to dismiss plaintiff's claim that Icahn and Crane Associates aided and abetted the Goodrich Directors' alleged breach of fiduciary duty and corporate waste is denied.

This Court certifies for interlocutory appeal defendants' motion to dismiss for failure to make demand.

SO ORDERED.